FLORIDA LIME & AVOCADO GROWERS, INC., ET
AL. *v.* PAUL, DIRECTOR OF THE DEPART-
MENT OF AGRICULTURE OF
CALIFORNIA, ET AL.

No. 45.  Argued January 8, 1963.—Decided May 13, 1963.*

---

*Together with No. 49, *Paul, Director of the Department of Agri-
culture of California, et al.* v. *Florida Lime & Avocado Growers, Inc.,
et al.,* also on appeal from the same Court.

*Isaac E. Ferguson* argued the cause and filed briefs for appellants in No. 45 and appellees in No. 49.

*John Fourt,* Deputy Attorney General of California, argued the cause for appellees in No. 45 and appellants in No. 49. With him on the briefs were *Stanley Mosk,* Attorney General, *Lawrence E. Doxsee,* Deputy Attorney General, and *William A. Norris.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Section 792 of California's Agricultural Code, which gauges the maturity of avocados by oil content, prohibits the transportation or sale in California of avocados which contain "less than 8 per cent of oil, by weight . . .

excluding the skin and seed." [1] In contrast, federal marketing orders approved by the Secretary of Agriculture gauge the maturity of avocados grown in Florida by standards which attribute no significance to oil content.[2] This case presents the question of the constitutionality of the California statute insofar as it may be applied to exclude from California markets certain Florida avocados which, although certified to be mature under the federal regulations, do not uniformly meet the California requirement of 8% of oil.

Appellants in No. 45, growers and handlers of avocados in Florida, brought this action in the District Court for the Northern District of California to enjoin the enforcement of § 792 against Florida avocados certified as mature under the federal regulations. Appellants challenged the constitutionality of the statute on three grounds: (1) that under the Supremacy Clause, Art. VI, the California standard must be deemed displaced by the federal standard for determining the maturity of avocados grown in Florida; (2) that the application of the California statute to Florida-grown avocados denied appellants the Equal

---

[1] Avocados not meeting this standard may not be sold in California. *Id..* § 784. Substandard fruits are "declared to be a public nuisance," and they may be seized, condemned, and abated. *Id.,* § 785. Violators may be punished criminally, *id.,* § 831 ($50 to $500 fine or imprisonment for not more than six months, or both), and by civil penalty action, *id.,* § 785.6 (market value of fruits).

[2] The orders are approved by the Secretary pursuant to § 8c of the Agricultural Adjustment Act, 7 U. S. C. § 608c. The basic marketing agreement provisions were initially adopted, in substantially their present form, in the 1935 amendments to the Agricultural Adjustment Act, 49 Stat. 750, 753–761. These sections were reenacted in 1937, 50 Stat. 246, as the Agricultural Marketing Agreement Act of 1937, virtually unchanged. Concerning the reasons for the reenactment, and the extent of the changes, see United States Department of Agriculture, Agricultural Adjustment 1937–1938 (1939), 72–73.

Protection of the Laws in violation of the Fourteenth Amendment; (3) that its application unreasonably burdened or discriminated against interstate marketing of Florida-grown avocados in violation of the Commerce Clause, Art. I, § 8. A three-judge District Court initially dismissed the complaint. 169 F. Supp. 774. On direct appeal we held, *Florida Lime & Avocado Growers, Inc., v. Jacobsen,* 362 U. S. 73, that the suit was one for a three-judge court under 28 U. S. C. § 2281, and presented a justiciable controversy to be tried on the merits. After a trial the three-judge court denied an injunction against the enforcement of § 792, on the ground that the proofs did not establish that its application to Florida-grown avocados violated any provision of the Federal Constitution. 197 F. Supp. 780. The District Court held for several reasons that the Supremacy Clause did not operate to displace § 792: no actual conflict existed between the statute and the federal marketing orders; neither the Agricultural Act nor the marketing orders occupied the field to the exclusion of the state statute; and Congress had not ordained that a federal marketing order was to give a license to Florida producers to "market their avocados without further inspection by the states" after compliance with the federal maturity test. 197 F. Supp., at 787. Rather, the court observed, "[t]he Federal law does not cover the whole field of interstate shipment of avocados" but by necessary implication leaves the regulation of certain aspects of distribution to the States. Further, the District Court found no violation of the Equal Protection Clause because the California statute was applicable on identical terms to Florida and California producers, and was reasonably designed to enforce a traditional and legitimate interest of the State of California in the protection of California consumers. The District Court concluded, finally, that § 792 did not unreasonably burden or discriminate against interstate commerce in out-of-state

avocados—that the 8% oil content test served in practice only to keep off California grocers' shelves fruit which was unpalatable because prematurely picked. This holding rested in part on the conclusion that mature Florida fruit had not been shown to be incapable of attaining 8% oil content, since only a very small fraction of Florida avocados of certain varieties in fact failed to meet the California test.[3]

Both parties have brought appeals here from the District Court's judgment: the Florida growers urge in No. 45 that the court erred in not enjoining enforcement of the state statute against Florida-grown avocados; in No. 49 the California state officials appeal on the ground that the action should have been dismissed for want of equity jurisdiction rather than upon the merits. We noted probable jurisdiction of both appeals. 368 U. S. 964, 965. We affirm the judgment in the respect challenged by the cross-appeal in No. 49. In No. 45 we agree that appellants have not sustained their challenges to § 792 under the Supremacy and Equal Protection Clauses. However, we reverse and remand for a new trial insofar as the judgment sus-

---

[3] The evidence in the record concerning the actual effect of the California maturity test upon Florida avocados is sketchy at best. The appellants introduced only one witness, a marketing expert in the United States Department of Agriculture, who testified concerning the relative scientific and other merits of the federal and California maturity tests. He gave no testimony concerning the actual impact of the California regulation upon shipments from Florida. One of appellees' witnesses at trial made cursory references to the fact that California inspectors had rejected and excluded some Florida shipments, but there was no testimony concerning the dates and quantities of any rejections. In a motion for dismissal and an accompanying affidavit before the District Court, the appellees presented certain figures concerning the percentage of Florida avocados which failed to comply with the California regulation during the years 1954 through 1957. There was, however, neither data for years after 1957 nor statistical proof at the trial which would corroborate these summary figures.

tains § 792 against appellants' challenge to the statute grounded on the Commerce Clause. We hold that the effect of the statute upon interstate commerce cannot be determined on the record now before us.

The California statute was enacted in 1925. Like the federal marketing regulations applicable to appellants, this statute sought to ensure the maturity of avocados reaching retail markets.[4] The District Court found on sufficient evidence that before 1925 the marketing of immature avocados had created serious problems in California.[5] An avocado, if picked prematurely, will not ripen properly, but will tend to decay or shrivel and become rubbery and unpalatable after purchase. Not only retail consumers but even experienced grocers have difficulty in distinguishing mature avocados from the immature by physical characteristics alone.[6] Thus, the District Court

---

[4] See Roche, Regulations for Marketing Avocados in California, in California Avocado Assn. 1937 Yearbook (1937), 88–89, concerning the purpose of the California oil-test statute. It has not been contended that the purpose of this statute is to ensure a certain caloric or nutritional value in avocados which reach the consumer. No health issue has been raised in this case. See 197 F. Supp., at 785–786.

[5] See also Church and Chace, Some Changes in the Composition of California Avocados During Growth (U. S. Dept. of Agriculture Bull. No. 1073, 1922), 2; Hodgson, The California Avocado Industry (Calif. Agricultural Extension Service Circular No. 43, 1930), 54–55; Hodges, Immature Avocado Selling Illegal, 111 Pacific Rural Press, Apr. 3, 1926, p. 435. And for a discussion of the particular problems encountered in the marketing of immature avocados in California, see Roche, supra, note 4, at 88–89.

[6] The nature of the avocado and its ripening process make it very difficult for any but the expert to gauge its maturity, and an avocado which may appear satisfactory at the time of purchase may later fail to ripen properly because it was prematurely picked. See, e. g., Ruehle, The Florida Avocado Industry (Univ. of Fla. Agr. Expt. Stations Bull. No. 602, 1958), 69; Avocado Maturity Tests, 37 Cali-

concluded, "[t]he marketing of . . . [immature] avocados cheats the consumer" and adversely affects demand for and orderly distribution of the fruit. 197 F. Supp., at 783.

The federal marketing regulations were adopted pursuant to the Agricultural Adjustment Act, 7 U. S. C. §§ 601 *et seq.* The declared purposes of the Act are to restore and maintain parity prices for the benefit of producers of agricultural commodities, to ensure the stable and steady flow of commodities to consumers, and "to establish and maintain such minimum standards of quality and maturity . . . as will effectuate such orderly marketing of such agricultural commodities as will be in the public interest," § 2 (3), 7 U. S. C. § 602 (3). Whenever he finds that it would promote these declared policies, the Secretary is empowered upon notice and hearing to adopt federal marketing orders and regulations for a particular growing area, § 8c (3), (4), 7 U. S. C. § 608c (3), (4). Orders thus proposed by the Secretary become effective only when approved by a majority of the growers or producers concerned, § 8c (8), (9), 7 U. S. C. § 608c (8), (9).

In 1954, after proceedings in compliance with the statute, 19 Fed. Reg. 3439, the Secretary promulgated orders governing the marketing of avocados grown in South Florida.[7] The orders established an Avocado Administrative Committee, composed entirely of South Florida avocado growers and handlers. 7 CFR § 969.20. This Committee has authority to draft and recommend to the Secretary various marketing regulations governing the

---

fornia Citrograph, Dec. 1951, p. 87; Roche, Look Out for Immature Avocados, 87 California Cultivator, Nov. 2, 1940, p. 590; Church and Chace, *supra,* note 5, at 2.

[7] This order is applicable only to avocados grown in the South Florida growing area. The California growers have not adopted a federal marketing order or agreement.

quality and maturity of South Florida avocados. The maturity test for the South Florida fruit is based upon a schedule of picking dates, sizes and weights annually drafted and recommended by the Committee and promulgated by the Secretary.[8]  The regulations forbid picking and shipping of any fruit before the prescribed date, although an exemption from the picking-date schedule may be granted by the Committee.[9]  The regulations drafted by the Committee and promulgated by the Secretary concern other qualities and physical characteristics of Florida avocados besides maturity.  See 22 Fed. Reg. 6205, 7 CFR §§ 51.3050–51.3053, 51.3064.   All regulated avocados, including those shipped under picking-date exemptions, must be inspected for compliance with certain quality standards by the Federal-State Inspection Service, a joint authority supervised by the United States and Florida Departments of Agriculture.

---

[8] The findings of the United States Department of Agriculture, contained in its order determining what terms should be contained in the avocado regulations, were that the marketing of immature fruits increases consumer resistance and materially impairs the marketing of the entire crop, that there was no satisfactory physical or chemical test for determining maturity, and that maturity can satisfactorily be determined by the picking-date-size method.  Handling of Avocados Grown in South Florida, 19 Fed. Reg. 2418, 2424–2425.

Each year since 1954, the Secretary has issued maturity regulations fixing the dates upon which each variety of Florida avocados may be picked and shipped.  See, e. g., 27 Fed. Reg. 5135–5136, 6705, 8264–8265, 9174–9175, 10090–10091.

[9] Section .53 of the regulations, 7 CFR § 969.53, provides that an exemption certificate shall be granted to a grower "who furnishes. proof, satisfactory to the committee, that his avocados of a particular variety are mature prior to the time such variety may be handled under such regulation." Such a certificate authorizes the recipient to "handle" the certified fruit, i. e., to "sell, consign, deliver, or transport avocados within the production area or between the production area and any point outside thereof . . . ." 7 CFR § 969.10.

Almost all avocados commercially grown in the United States come either from Southern California or South Florida. The California-grown varieties are chiefly of Mexican ancestry, and in most years contain at least 8% oil content when mature.[10] The several Florida species, by contrast, are of West Indian and Guatemalan ancestry. West Indian avocados, which constitute some 12% of the total Florida production, may contain somewhat less than 8% oil when mature and ready for market. They do not, the District Court found, attain that percentage of oil "until they are past their prime." 197 F. Supp., at 783. But that variety need not concern us in this case, since the District Court concluded on sufficient evidence that "poor shipping qualities and short retail store shelf-life" make it commercially unprofitable, regardless of the oil test, to market the variety in California. On the other hand, the Florida hybrid and Guatemalan varieties, which do not encounter such handicaps, *may* reach maturity before they attain 8% oil content. The District Court concluded, nevertheless, that § 792 did not unreasonably interfere with their marketability since these species "attain or exceed 8% oil content while in a prime commercial marketing condition," so that the California test was "scientifically valid as applied to" these varieties.

The experts who testified at the trial disputed whether California's percentage-of-oil test or the federal marketing orders' test of picking dates and minimum sizes and weights was the more accurate gauge of the maturity of

---

[10] See Traub et al., Avocado Production in the United States (U. S. Dept. of Agriculture Circular No. 620, 1941), 6–8. Occasionally, however, even California growers have experienced difficulty in meeting the oil content requirement, and sizable shipments have had to be destroyed. See Demand for Avocados, 74 California Cultivator, Feb. 8, 1930, p. 167; Roche, Look Out for Immature Avocados, 87 California Cultivator, Nov. 2, 1940, p. 590; California Avocado Assn. 1937 Yearbook (1937), 88.

avocados.[11] In adopting his calendar test of maturity for the varieties grown in South Florida the Secretary expressly rejected physical and chemical tests as insufficiently reliable guides for gauging the maturity of the Florida fruit.[12]

## I.

We consider first appellants' challenge to § 792 under the Supremacy Clause. That the California statute and the federal marketing orders embody different maturity tests is clear. However, this difference poses, rather than disposes of the problem before us. Whether a State may constitutionally reject commodities which a federal authority has certified to be marketable depends upon whether the state regulation "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines* v. *Davidowitz*, 312 U. S. 52, 67. By that test, we hold that § 792 is not such an obstacle; there is neither such actual conflict between the two schemes of regulation that both cannot stand in the same area, nor evidence of a congressional design to pre-empt the field.

We begin by putting aside two suggestions of the appellants which obscure more than aid in the solution of the problem. First, it is suggested that a federal license or certificate of compliance with minimum federal standards immunizes the licensed commerce from inconsistent or more demanding state regulations. While this suggestion draws some support from decisions which have invalidated direct state interference with the activities of interstate *carriers, Castle* v. *Hayes Freight Lines, Inc.,*

---

[11] Compare Hodgson, The California Avocado Industry (Calif. Agricultural Extension Service Circular No. 43, 1930), 39.

[12] See 19 Fed. Reg. 2418, 2424–2425; compare Harding, The Relation of Maturity to Quality in Florida Avocados, 67 Florida State Horticultural Society Proceedings, 276 (1954).

348 U. S. 61, even in that field of paramount federal concern the suggestion has been significantly qualified, *e. g., Huron Portland Cement Co.* v. *Detroit,* 362 U. S. 440, 447–448; *Kelly* v. *Washington,* 302 U. S. 1; cf. *Bradley* v. *Public Utilities Comm'n,* 289 U. S. 92. That no State may completely exclude federally licensed commerce is indisputable, but that principle has no application to this case.

Second, it is suggested that the coexistence of federal and state regulatory legislation should depend upon whether the *purposes* of the two laws are parallel or divergent. This Court has, on the one hand, sustained state statutes having objectives virtually identical to those of federal regulations, *California* v. *Zook,* 336 U. S. 725, 730–731; cf. *De Veau* v. *Braisted,* 363 U. S. 144, 156–157; *Parker* v. *Brown,* 317 U. S. 341; and has, on the other hand, struck down state statutes where the respective purposes were quite dissimilar, *First Iowa Hydro-Electric Cooperative* v. *Federal Power Comm'n,* 328 U. S. 152. The test of whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives.

The principle to be derived from our decisions is that federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained. See, *e. g., Huron Portland Cement Co.* v. *Detroit, supra.*

## A.

A holding of federal exclusion of state law is inescapable and requires no inquiry into congressional design where compliance with both federal and state regulations is a

physical impossibility for one engaged in interstate commerce, cf. *Union Bridge Co.* v. *United States,* 204 U. S. 364, 399–401; *Morgan* v. *Virginia,* 328 U. S. 373; *Bibb* v. *Navajo Freight Lines, Inc.,* 359 U. S. 520. That would be the situation here if, for example, the federal orders forbade the picking and marketing of any avocado testing more than 7% oil, while the California test excluded from the State any avocado measuring less than 8% oil content. No such impossibility of dual compliance is presented on this record, however. As to those Florida avocados of the hybrid and Guatemalan varieties which were actually rejected by the California test, the District Court indicated that the Florida growers might have avoided such rejections by leaving the fruit on the trees beyond the earliest picking date permitted by the federal regulations, and nothing in the record contradicts that suggestion. Nor is there a lack of evidentiary support for the District Court's finding that the Florida varieties marketed in California "attain or exceed 8% oil content while in a prime commercial marketing condition," even though they may be "mature enough to be acceptable prior to the time that they reach that content . . . ." 197 F. Supp., at 783. Thus the present record demonstrates no inevitable collision between the two schemes of regulation, despite the dissimilarity of the standards.

### B.

The issue under the head of the Supremacy Clause is narrowed then to this: Does either the nature of the subject matter, namely the maturity of avocados, or any explicit declaration of congressional design to displace state regulation, require § 792 to yield to the federal marketing orders? The maturity of avocados seems to be an inherently unlikely candidate for exclusive federal regulation. Certainly it is not a subject by its very nature admitting only of national supervision, cf. *Cooley*

v. *Board of Port Wardens,* 12 How. 299, 319–320. Nor is it a subject demanding exclusive federal regulation in order to achieve uniformity vital to national interests, cf. *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236, 241–244.

On the contrary, the maturity of avocados is a subject matter of the kind this Court has traditionally regarded as properly within the scope of state superintendence. Specifically, the supervision of the readying of foodstuffs for market has always been deemed a matter of peculiarly local concern. Many decades ago, for example, this Court sustained a State's prohibition against the importation of artificially colored oleomargarine (which posed no health problem), over claims of federal preemption and burden on commerce. In the course of the opinion, the Court recognized that the States have always possessed a legitimate interest in "the protection of . . . [their] people against fraud and deception in the sale of food products" at retail markets within their borders. *Plumley* v. *Massachusetts,* 155 U. S. 461, 472. See also *Crossman* v. *Lurman,* 192 U. S. 189, 199–200; *Hygrade Provision Co.* v. *Sherman,* 266 U. S. 497; *Savage* v. *Jones,* 225 U. S. 501, 525–529.

It is true that more recently we sustained a federal statute broadly regulating the production of renovated butter. But we were scrupulous in pointing out that a State might nevertheless—at least in the absence of an express contrary command of Congress—confiscate or exclude from market the processed butter which had complied with all the federal *processing* standards, "because of a higher standard demanded by a state for its consumers." A state regulation so purposed was, we affirmed, "permissible under all the authorities." [13] *Cloverleaf*

---

[13] It is true that the statute involved in the *Cloverleaf* case provided that federal law was not intended to displace state laws "enacted in the exercise of [the States'] police powers . . . ." 32 Stat. 193, 21

*Butter Co.* v. *Patterson,* 315 U. S. 148, 162. That distinction is a fundamental one, which illumines and delineates the problem of the present case. Federal regulation by means of minimum standards of the picking, processing, and transportation of agricultural commodities, however comprehensive *for those purposes* that regulation may be, does not of itself import displacement of state control over the distribution and retail sale of those commodities in the interests of the *consumers* of the commodities within the State. Thus, while Florida may perhaps not prevent the exportation of federally certified fruit by superimposing a higher maturity standard, nothing in *Cloverleaf* forbids California to regulate their marketing. Congressional regulation of one end of the stream of commerce does not, *ipso facto,* oust all state regulation at the other end. Such a displacement may not be inferred automatically from the fact that Congress has regulated production and packing of commodities for the interstate market. We do not mean to suggest that certain local regulations may not unreasonably or arbitrarily burden interstate commerce; we consider that question separately, *infra,* pp. 152–154. Here we are concerned only whether partial congressional superintendence of the field (maturity for the purpose of introduction of Florida fruit into the stream of interstate commerce) automatically forecloses regulation of maturity by another State in the interests of that State's consumers of the fruit.

---

U. S. C. § 25. But this proviso was presumably intended to do no more than recognize explicitly an accommodation between federal and state interests to which Congress and the decisions of this Court have consistently adhered. Nor did the Court's deference to state regulation rest upon this congressional proviso. Rather, the Court simply considered it a well-settled proposition that a State may impose upon imported foodstuffs "a higher standard demanded . . . for its consumers."

The correctness of the District Court's conclusion that § 792 was a regulation well within the scope of California's police powers is thus clear. While it is conceded that the California statute is not a health measure, neither logic nor precedent invites any distinction between state regulations designed to keep unhealthful or unsafe commodities off the grocer's shelves, and those designed to prevent the deception of consumers.[14] See, e. g., Hygrade Provision Co. v. Sherman, supra; Plumley v. Massachusetts, supra. Nothing appearing in the record before us affords any ground for departure in this case from our consistent refusal to draw such a distinction.

## C.

Since no irreconcilable conflict with the federal regulation requires a conclusion that § 792 was displaced, we turn to the question whether Congress has nevertheless ordained that the state regulation shall yield. The settled mandate governing this inquiry, in deference to the fact that a state regulation of this kind is an exercise of the "historic police powers of the States," is not to decree such a federal displacement "unless that was the clear and manifest purpose of Congress," Rice v. Santa Fe Elevator Corp., 331 U. S. 218, 230. In other words, we are not to conclude that Congress legislated the ouster of this California statute by the marketing orders in the absence

---

[14] It might also be argued that the California statute, having been designed to test the maturity only of California avocados, bears no rational relationship to the marketability of Florida fruit. Such a contention would seem untenable, however, in the face of the District Court's express finding of fact, supportable on the testimony before it, that "[a] standard requiring a minimum of 8% of oil in an avocado before it may be marketed is scientifically valid as applied to hybrid and Guatemalan varieties of avocados grown in Florida and marketed in California." And there is considerable dispute as to the oil content of Florida avocados which have been certified as mature under the federal regulations. See note 21, infra.

of an unambiguous congressional mandate to that effect. We search in vain for such a mandate.

The provisions and objectives of the Agricultural Adjustment Act bear little resemblance to those in which only last Term we found a preemptive design in *Campbell* v. *Hussey*, 368 U. S. 297. In the Federal Tobacco Inspection Act involved in that case, Congress had declared "uniform standards of classification and inspection" to be "imperative for the protection of producers and others engaged in commerce and the public interest therein." 7 U. S. C. § 511a. The legislative history was replete with references to a need for "uniform" or "official" standards, which could harmonize the grading and inspection of tobacco at all markets throughout the country. Under the statute a single set of standards was to be promulgated by the Secretary of Agriculture, "and the standards so established would be the official standards of the United States for such purpose." S. Rep. No. 1211, 74th Cong., 1st Sess. 1.

Nothing in the language of the Agricultural Adjustment Act—passed by the same Congress the very next day [15]—discloses a similarly comprehensive congressional design. There is but one provision of the statute which intimates any purpose to make agricultural production controls the monitors of retail distribution—the reference to a policy of establishing such "minimum standards of quality and maturity and such grading and inspection requirements . . . as will effectuate . . . orderly marketing . . . in the public interest." 7 U. S. C. § 602 (3). That language cannot be said, without more, to reveal a design that federal marketing orders should displace all state

---

[15] The marketing agreement provisions were enacted among the 1935 amendments to the Agricultural Adjustment Act, 49 Stat. 750, 753–761. These amendments were accepted by Congress the day following the enactment of the Tobacco Inspection Act, 49 Stat. 731–735.

regulations. By its very terms, in fact, the statute purports only to establish *minimum* standards.

Other provisions of the Act, and their history, militate even more strongly against federal displacement of these state regulations. First, the adoption of marketing agreements and orders is authorized only when the Secretary has determined that economic conditions within a particular growing area require federally supervised cooperation among the growers to alleviate those conditions. 7 U. S. C. § 608c (1), (2). Moreover, the relief afforded the growers is to be temporary; "the Secretary is directed to cease exercising such powers" when "the circumstances described . . . no longer exist." H. R. Rep. No. 1241, 74th Cong., 1st Sess. 4. And consistently with these terms, the Secretary himself has characterized the marketing agreements as essentially "self-help programs" instituted and administered by the farmers involved. This view has recently been elaborated by the Secretary:

> "The Act itself does not impose regulations over the marketing of any agricultural commodity. It merely provides the authority under which an industry can develop regulations to fit its own situation and solve its own marketing problems." United States Department of Agriculture, Marketing Agreements and Orders, AMS–230 (rev. ed. 1961), 3. See also United States Department of Agriculture, Agricultural Adjustment 1937–1938 (1939), 71.

Second, the very terms of the statute require that the Secretary promulgate marketing orders "limited in their application to the smallest regional production areas" which he finds practicable; and the orders are to "prescribe such different terms, applicable to different production areas and marketing areas" as will serve to "give due recognition to the differences in production and market-

ing" between those areas. 7 U. S. C. § 608c (11). While this language is not conclusive on the question before us, it indicates that Congress contemplated—quite by contrast to the design embodied in the Tobacco Inspection Act—that there might be widespread regional variations in the standards governing production and processing. Thus avocado growers in another region could, for example, propose—and the Secretary would presumably adopt—maturity regulations which would gauge the marketability of the fruit not by the calendar, as do the South Florida rules, but by the color of the skin, or the texture and color of the seed-coat, or perhaps even by oil content. Thus if the Congress of 1935 really intended that distribution would be comprehensively governed by grower-adopted quality and maturity standards, and all state regulation of the same subject would be ousted, it does not seem likely that the statute would have invited local variations at the production end while saying absolutely nothing about the effect of those production controls upon distribution for consumption.

A third factor which strongly suggests that Congress did not mandate uniformity for each marketing order arises from the legislative history. The provisions concerning the limited duration and local application of marketing agreements received much attention from both House and Senate Committees reporting on the bill. Though recognizing that the powers conferred upon the Secretary were novel and extensive, both Committees concluded: "These and other restrictive provisions are ... adequately drawn to guard against any fear that the regulatory power is so broad as to subject its exercise to the risk of abuse." H. R. Rep. No. 1241, 74th Cong., 1st Sess. 7; S. Rep. No. 1011, 74th Cong., 1st Sess. 3. The Committee Reports also discussed § 10 (i), 7 U. S. C. § 610 (i), which authorized federal-state cooperation

in the administration of the program, and cautioned significantly:

> "Notwithstanding the authorization of cooperation contained in this section, there is nothing in it to permit or require the Federal Government to invade the field of the States, for the limitations of the act and the Constitution forbid federal regulation in that field, and this provision does not indicate the contrary. Nor is there anything in the provision to force States to cooperate. Each sovereignty operates in its own sphere but can exert its authority in conformity rather than in conflict with that of the other."
> H. R. Rep. No. 1241, 74th Cong., 1st Sess. 22–23; S. Rep. No. 1011, 74th Cong., 1st Sess. 15.

Thus the revealed congressional design was apparently to do no more than to invite farmers and growers to get together, under the auspices of the Department of Agriculture, to work out local harvesting, packing and processing programs and thereby relieve temporarily depressed marketing conditions. Had Congress meant the Act to have in addition a pervasive effect upon the ultimate distribution and sale of produce, evidence of such a design would presumably have accompanied the statute, as it did the Tobacco Inspection Act, see *Campbell* v. *Hussey, supra.* In the absence of any such manifestations, it would be unreasonable to infer that Congress delegated to the growers in a particular region the authority to deprive the States of their traditional power to enforce otherwise valid regulations designed for the protection of consumers.

An examination of the operation of these particular marketing orders reinforces the conclusion we reach from this analysis of the terms and objectives of the statute. The regulations show that the Florida avocado maturity standards are drafted each year not by impartial experts in Washington or even in Florida, but rather by the South

Florida Avocado Administrative Committee, which consists entirely of representatives of the growers and handlers concerned. It appears that the Secretary of Agriculture has invariably adopted the Committee's recommendations for maturity dates, sizes, and weights.[16] Thus the pattern which emerges is one of maturity regulations drafted and administered locally by the growers' own representatives, and designed to do no more than promote orderly competition among the South Florida growers.[17]

This case requires no consideration of the scope of the constitutional power of Congress to oust all state regulation of maturity, and we intimate no view upon that ques-

---

[16] Although the Manager of the Avocado Administrative Committee stated in his deposition (which was neither formally admitted nor excluded by the District Court) that the Secretary had occasionally rejected orders recommended by the Committee, he insisted that as to *maturity* regulations "the Secretary has always followed the Committee's recommendations."

[17] Significant with regard to the essentially local nature of the orders and their administration is the testimony in a deposition (on the admissibility of which the District Court did not rule) of the supervising inspector of fruits and vegetables of the Federal and State Agricultural Inspection Service for the South Florida district:

". . . these regulations from time to time are subject to change at the direction of the Avocado Administrative Committee. Whenever they do change them, Mr. Biggar, the manager of the Avocado Administrative Committee, immediately furnishes the inspection service with copies of the effective rules and changes. There are times when they change them, and when they change them I am the first man to get the changed regulations, because I have to see that the inspectors get the revised regulations issued by the Avocado Administrative Committee."

For further evidence that the avocado marketing agreement was undertaken chiefly as a "self-help program," designed only to regulate South Florida production and ensure maturity of the produce from that growing area, see Krome, The Federal Avocado Marketing Agreement, 67 Florida State Horticultural Society Proceedings 268 (1954).

tion.[18] It is enough to decide this aspect of the present case that we conclude that Congress has not attempted to oust or displace state powers to enact the regulation embodied in § 792. The most plausible inference from the legislative scheme is that the Congress contemplated that state power to enact such regulations should remain unimpaired.

## II.

We turn now to appellants' arguments under the Equal Protection and Commerce Clauses.

It is enough to dispose of the equal protection claim that we express our agreement with the District Court that the state standard does not work an "irrational discrimination as between persons or groups of persons," *Goesaert v. Cleary,* 335 U. S. 464, 466; cf. *Railway Express Agency, Inc., v. New York,* 336 U. S. 106. While it may well be that arguably superior tests of maturity could be devised, we cannot say, in derogation of the findings of the District Court, that this possibility renders the choice made by California either arbitrary or devoid of rational relationship to a legitimate regulatory interest. Whether or not the oil content test is the *most* reliable indicator of marketability of avocados is not a question for the courts to decide; it is sufficient that on this record we should conclude, as we do, that oil content appears to be an acceptable criterion of avocado maturity.

More difficult is the claim that the California statute unreasonably burdens or discriminates against interstate

---

[18] Compare, *e. g., Oregon-Washington R. & Nav. Co. v. Washington,* 270 U. S. 87; *McDermott v. Wisconsin,* 228 U. S. 115. See generally Note, Federal Inspection Legislation—A Partial Remedy for Interstate Trade Barriers, 53 Harv. L. Rev. 1185 (1940).

Nor have we any occasion to consider the possible applicability to the Supremacy Clause issue of the provisions of 21 U. S. C. § 341, since neither party has made any reference to that statute either before the District Court or in this Court.

commerce because its application has excluded Florida avocados from the State. Although Florida and California were competitors in avocado production when the statute was passed in 1925, the present record permits no inference that the California statute had a discriminatory objective.[19] Nevertheless it may be that the continued appli-

[19] The District Court assumed that in 1925 California growers faced no meaningful competition from Florida growers. It appears, however, that the Florida industry was well developed when the California industry was in its infancy, see Collins, The Avocado, A Salad Fruit From the Tropics (U. S. Dept. of Agriculture Bureau of Plant Industry, Bull. No. 77, 1905), 35–36. Not only does there appear to have been vigorous competition between Florida and California producers for all markets in 1925, see Popenoe, The Avocado—California vs. Florida, 61 California Cultivator, Nov. 3, 1923, p. 459; but in some years during the 1920's the Florida production exceeded that of California. See Traub, *supra*, note 10, at 2. See generally Hodgson, *supra*, note 5, at 60, 82–83.

The passage of the California statute was immediately and vigorously protested by Florida producers, and a United States Senator from Florida filed an informal complaint with the Department of Agriculture, see, *e. g.*, California Avocado Law Unfair to Florida: New Pacific Coast Maturity Standards Practically Ban All Shipments from this State, 32 Florida Grower, Nov. 7, 1925, pp. 4, 22. See also *id.*, Nov. 21, 1925, p. 15. Even in California there was contemporaneous recognition that passage of the statute severely restricted the access of Florida growers to the markets at least of Northern California; see Hodgson, The Florida Avocado Industry—A Survey II, 66 California Cultivator, June 26, 1926, pp. 721, 743. And see 80 American Fruit Grower, Feb. 1960, p. 64.

On the other hand, there have been suggestions that neither the adoption nor the application of the California statute reflected any discriminatory or anticompetitive purpose. In some years, California growers themselves experience great difficulty meeting the oil content requirement, and sizable shipments must be destroyed—see Demand for Avocados, 74 California Cultivator, Feb. 8, 1930, p. 167; Roche, Look Out for Immature Avocados, 87 California Cultivator, Nov. 2, 1940, p. 590; California Avocado Assn., 1937 Yearbook (1937), 88— even though the oil content of mature California avocados in good years runs substantially above 8%, see Traub, *supra*, note 10, at 6–8. Moreover, the California Growers' Association has regarded its ability

cation of this regulation to Florida avocados has imposed an unconstitutional burden on commerce, or has discriminated against another State's exports of the particular commodity. Other state regulations raising similar problems have been found to be discriminatory or burdensome notwithstanding a legitimate state interest in some form of regulation—either because they exceeded the limits necessary to vindicate that interest, *Dean Milk Co.* v. *Madison,* 340 U. S. 349, or because they unreasonably favored local producers at the expense of competitors from other States, *Baldwin* v. *Seelig, Inc.,* 294 U. S. 511. Such a state regulation might also constitute an illegitimate attempt to control the conduct of producers beyond the borders of California, cf. *Bibb* v. *Navajo Freight Lines, Inc., supra; Southern Pacific Co.* v. *Arizona,* 325 U. S. 761, 775.

The District Court referred to these precedents but nevertheless concluded that the California oil content test was not burdensome upon or discriminatory against interstate commerce. 197 F. Supp., at 786–787. However, we are unable to review that conclusion or decide whether the court properly applied the principles announced in these decisions because we cannot ascertain what constituted the record on which the conclusion was predicated. Much of the appellants' offered proof consisted of depositions and exhibits, designed to detail both the rejection of Florida avocados in California and the oil content of Florida avocados which had met the federal test but which might nonetheless have been excluded from California markets.

to market Florida fruit during the months when California fruit is not available as strengthening rather than weakening its own market position. See Fourteenth Annual Report of the General Manager of the Calavo Growers of California (1937), 20. Plainly the questions indicated by these conflicting materials can be resolved only at a trial fully developing the Commerce Clause issue.

The parties' own assumptions concerning the content of the record are in irreconcilable conflict: the appellants have argued the case on the apparent assumption that the depositions and exhibits *were* admitted before the District Court; the appellees, on the other hand, have assumed both in their briefs and in oral argument that the disputed evidence *was not* admitted. This lack of consensus is altogether understandable in light of the confusion created by the District Court's evidentiary rulings. The appellees objected to the introduction of the disputed materials on several grounds, both during and after the trial. The court expressly reserved its rulings on the issue of admissibility, and after the entry of its order on the merits of the case made a supplemental "ruling on evidentiary matters," in which it stated that the disputed exhibits and depositions "are not admitted into evidence, but have been considered by the Court as an offer of proof by the plaintiffs . . . ." The earlier memorandum of the court explained that it would "assume, *arguendo,* that the exhibits and depositions offered by plaintiffs are all admissible." 197 F. Supp., at 782. If this was intended to mean that appellants would not have made out a case for relief, even were the evidence to be admitted, then there would have been no need to rule on admissibility. But we are unable to determine, just as the parties were unable to agree, whether the District Court viewed the evidence in that posture.[20]

---

[20] At the very close of the trial, two of the three members of the court offered inconsistent views when appellees' counsel asked for clarification concerning the status of appellants' disputed depositions and exhibits. One member of the court replied that "your objections stand to every word that is in these depositions here," while another responded, "[t]hey are all in evidence subject to your objections and the Court will rule on them when it makes its ruling in the case if it is necessary."

Thus the only evidence which would seem to support an injunction on the ground of burden on interstate commerce has never been formally admitted to the record in this case. For this Court to reverse and order an injunction on the basis of that evidence would be, in effect, to admit the contested depositions and exhibits on appeal without ever affording the appellees an opportunity to argue their seemingly substantial objections.[21] To assume the admissibility of the evidence under these circumstances would be to deny the appellees their day in court as to a disputed part of the case on which the trial court has never ruled because its view of the law evidently made such a ruling unnecessary. Cf. *Byrd* v. *Blue Ridge Rural Electric Cooperative, Inc.*, 356 U. S. 525, 533; *Fountain* v. *Filson,* 336 U. S. 681; *Globe Liquor Co.* v. *San Roman,* 332 U. S. 571. On the other hand, to affirm the District Court would require us to make equally impermissible assumptions as to the state of the record. Cf. *Florida* v. *United States,* 282 U. S. 194, 215.

For these reasons we conclude that the judgment must, to the extent appealed from in No. 45, be reversed and the case remanded to the District Court for a new trial of appellants' Commerce Clause contentions. We intimate no view with respect to either the admissibility or the probative value of the disputed evidence, or of any other evidence which might be brought forth by either party concerning this aspect of the case.

---

[21] Specifically, appellees offered to show that in measuring the oil content of avocados the Florida experimental test procedures did not employ the same equipment as is used in California, the former, so it was contended, extracting less oil than the California equipment would obtain from the same avocado. They claimed that the average variation amounted to a failure of the Florida equipment to remove 2.9% of the oil from the fruit, and, further, that the Florida results were erratic. In addition, appellees asserted that the avocados used in the Florida experiments were not representative of the graded, sized, and inspected fruit that appellants would normally market.

## III.

In No. 49, the state officers cross-appeal on the ground that the District Court should have dismissed the action for want of equity, rather than for lack of merit. Their contention is that there was insufficient showing of injury to the Florida growers to invoke the District Court's equity jurisdiction. We reject that contention, and affirm the judgment insofar as it is challenged by the cross-appeal.

In *Florida Lime & Avocado Growers, Inc., v. Jacobsen,* 362 U. S. 73, we held that because of the Florida growers' allegations that California officials had consistently condemned Florida avocados as unfit for sale in California, "thus requiring appellants [the Florida growers]—to prevent destruction and complete loss of their shipments—to reship the avocados to and sell them in other States," it was evident that "there is an existing dispute between the parties as to present legal rights amounting to a justiciable controversy which appellants are entitled to have determined on the merits." 362 U. S., at 85–86. In view of our mandate in *Jacobsen,* therefore, the District Court necessarily assumed jurisdiction and heard the case on its merits. Cf. *United States* v. *Haley,* 371 U. S. 18.

Even on the present ambiguous record, we think that the Florida growers have demonstrated sufficient injury to warrant at least a trial of their allegations. In the California officials' briefs below, it was conceded that the Florida growers had suffered damage in the amount of some $1,500 by reason of the enforcement of the statute. Before the bar of this Court, it was conceded that the State, in objecting to the growers' proffered evidence, did not dispute the claim that some shipments of Florida avocados had in fact been rejected by California for failure to comply with the oil content requirement. Indeed, the

State conceded in its pleadings before the trial court that rejections of Florida avocados had averaged in recent years as much as 6.4% of the total shipments of Florida fruit into California. While these concessions were not corroborated by statistical proofs at trial, and thus do not form an adequate basis for the entry of a final injunction, they nevertheless supplied an adequate basis, apart from the requirement of our remand, for the District Court's proceeding to trial on the merits.

In addition, it is clear that the California officials will continue to enforce the statute against the Florida-grown avocados, for the State's answer to the complaint declared that these officials "have in the past and now stand ready to perform their duties under their oath of office should they acquire knowledge of violations of the Agricultural Code of the State of California." Thus the District Court, both on the pleadings before it, and in light of our opinion in *Jacobsen,* properly heard the remanded case on the merits and did not err in refusing to dismiss for want of equity jurisdiction.

The cross-appellants rely upon the court's finding of fact that "[p]laintiffs have neither suffered nor been threatened with irreparable injury." This finding was, however, adopted pursuant to that court's prior opinion, which stated that "[p]laintiffs' monetary losses as a result of the rejected shipments are not clearly established, but at most do not appear to be over two or three thousand dollars." 197 F. Supp., at 783–784. We read this finding as importing no more than the District Court's view that whatever harm or damage the Florida growers might have suffered fell short of the "irreparable injury" requisite for the entry of an injunction against enforcement of the statute.

The judgment of the District Court is reversed and the cause is remanded for a new trial limited to appellants'

claim in No. 45 that the enforcement of § 792 unreasonably burdens or discriminates against interstate commerce. In the respect challenged by the cross-appeal in No. 49, the judgment is affirmed

*It is so ordered.*

MR. JUSTICE WHITE, with whom MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS and MR. JUSTICE CLARK join, dissenting in No. 45.

This is the second time this case has come before the Court. In *Florida Lime & Avocado Growers, Inc., v. Jacobsen,* 362 U. S. 73, the case was here for review of dismissal of the complaint for want of jurisdiction. The Court reversed and remanded for trial and the case is now here on the merits, after the three-judge District Court refused to enjoin the appellee state officers from enforcing § 792 of the California Agricultural Code against the appellant growers. 197 F. Supp. 780, probable jurisdiction noted, 368 U. S. 964, 965. In view of the Court's disposition of the matter today, it is probable that this case like a revenant will return to us within another few Terms with a still more copious record.

Appellants grow, package, and market Florida avocados in interstate commerce, subject to the applicable provisions of § 8c of the Agricultural Adjustment Act, as amended, 7 U. S. C. § 608c, and the regulations of the Secretary of Agriculture promulgated thereunder. An average of 6.4% of the Florida avocados shipped to California each year are barred for failure to satisfy the requirements of California Agricultural Code § 792,[1] which

---

[1] There is no question in this case as to whether the California oil content law keeps out of California Florida avocados which pass the federal test. In their motion to dismiss and the accompanying sworn affidavit below, the appellee state officers gave 6.4% as the average rejection figure per year; over a four-year period, basing the per-

provides in pertinent part that "all avocados, at the time of picking, and at all times thereafter, shall contain not less than 8 per cent of oil, by weight of the avocado excluding the skin and seed." [2] Appellants based their claim for relief upon the Equal Protection Clause of the Fourteenth Amendment, the Commerce Clause, and the Supremacy Clause. Since we in the minority have concluded that the Agricultural Adjustment Act and regulations promulgated thereunder leave no room for this inconsistent and conflicting state legislation, we reach only the Supremacy Clause issue.

The California statute was enacted in 1925, when, according to the District Court, practically all the avocados in the United States came from that State. 197 F. Supp., at 782. The purpose of this legislation was to prevent the marketing of immature avocados, which never

---

centage on the official records of the California Department of Agriculture. Rejections reached a high of 16.4% in the 1955–1956 season. It is hard to understand the Court's refusal to consider the figures because of the way they entered the record. See ante, p. 136 and n. 3, and p. 157. We believe appellees' sworn statements as to the State's official records are properly before the Court now, and that in any event they will come into the record shortly, since it is clear that on remand the same data will come in via deposition. If the majority actually has any doubt on this score, and believes that accepting as a fact that California rejects six out of every 100 Florida avocados as immature would have an effect on the result, it should remand for further findings on preemption as it does on burden on commerce. The same papers below, and the opinion of the District Court, 197 F. Supp., at 783, reveal that about 5% of the appellants' shipments to California have been rejected for failure to attain the 8% oil content required under California law. The record is silent on the in terrorem effect of the California law on interstate commerce in Florida avocados, and we therefore do not consider it here.

[2] Avocados not meeting this standard may not be sold in California, are "declared to be a public nuisance," and they may be seized, condemned, and abated. Violators may be punished criminally and by civil penalty action. See ante, p. 134, at n. 1.

ripen properly, but decay or shrivel up and become rubbery and unpalatable after purchase by the consumer.[3] *Ibid.* The effect of marketing immature avocados is to "cheat the consumer," and thus have "a bad [economic] effect upon retailers and producers as a whole, since it increases future sales resistance" against buying avocados. *Id.,* at 783.

In 1925, when the state law was enacted, most of the avocados grown in California were, as they are at the present time, from trees derived from Mexican varieties. Such avocados contain at least 8% oil when mature. The Florida avocado growers, however, the only substantial competitors of the California growers, 197 F. Supp., at 787, n. 8, depend in substantial part on trees of non-Mexican parentage. The Florida avocados involved here, hybrid and Guatemalan varieties, may reach maturity and be acceptable for marketing, at least under federal standards, prior to reaching an 8% oil content.[4]

---

[3] It is not contended that the purpose of the 8% minimum oil content requirement is for the purpose of insuring a high caloric or other nutritional content in the fruit. No health issue has been raised in this case. Cf. 197 F. Supp., at 785–786. Nor has it been contended at any stage of the proceedings that the statutory purpose is directly to protect local consumers from fraudulent and deceptive practices; moreover, there is no evidence to support that view.

[4] "Mexican varieties of avocados contain (generally speaking) the highest oil content of any varieties, when mature. Hybrid varieties attain the next highest oil percentages, and West Indian the lowest. Hybrid varieties generally attain oil content in excess of 8% if left on the trees long enough, but they do not necessarily attain such an oil content by the time that they may be marketed under the Florida Avocado Order. They are mature enough to be acceptable prior to the time that they reach that content, according to plaintiffs' witnesses." 197 F. Supp., at 783.

While it would appear to be theoretically feasible to determine the proper oil content to gauge maturity for each different variety of avocado, this is highly impracticable, as the District Court pointed out; over 40 varieties of avocado are marketed in Florida. *Id.,* at 785.

There is expert opinion to the effect that the best gauge of maturity is the percentage of oil contained in the fruit. *Id.,* at 783. California has adopted that physical-chemical test in § 792. There is also expert opinion that the best test of maturity is the date on which the fruit is picked, and its size and weight at such time. *Ibid.* The United States Secretary of Agriculture has adopted that test for measuring maturity of avocados for ripening, and has specifically rejected as unsatisfactory all physical and chemical tests. Handling of Avocados Grown in South Florida, 19 Fed. Reg. 2418, 2424–2425 (Dept. Agr. Dkt. No. AO–254). The District Court found the California oil test to be of the latter type.

## I.

The Agricultural Adjustment Act, § 8c, 7 U. S. C. § 608c, provides that, whenever the Secretary "has reason to believe that the issuance of an order will tend to effectuate the declared policy" of the Act, which is "to establish and maintain such minimum standards of quality and maturity . . . [for fruit] in interstate commerce as will effectuate . . . [the] orderly marketing of . . . agricultural commodities as will be in the public interest," § 2 (3), 7 U. S. C. § 602 (3), he shall give notice for and hold a hearing upon a proposed order. In the case of fruits, § 8c (6)(A) provides that the Secretary may limit or provide methods for the limitation of quality of produce "which may be marketed in or transported to any or all markets in the current of interstate or foreign commerce . . . ," or affecting commerce, during any specified period.

Orders proposed by the Secretary under this statute become effective only when approved by a majority of the affected growers. See § 8c (8)–(9). In 1954 the Secretary held hearings and found that a majority of the South Florida avocado growers favored imposition

of quality and maturity standards for avocados pursuant to a marketing order promulgated under the Act. 19 Fed. Reg. 3439.[5] The order, *id.*, at 3440–3443, as amended, 7 CFR § 915.1–.71 (formerly §§ 969.1–969.71), establishes an Avocado Administrative Committee, comprised of South Florida avocado growers and shippers, with the power to recommend marketing regulations to the Secretary relating to quality and maturity standards and prohibiting the marketing of substandard fruits.[6]  It

---

[5] The findings of the United States Department of Agriculture, contained in its order determining what terms should be contained in the avocado regulations, were that the marketing of immature fruits increases consumer resistance and materially impairs the marketing of the entire crop, that there was no satisfactory physical or chemical test for determining maturity, and that maturity can satisfactorily be determined by the picking-date-size method.  Handling of Avocados Grown in South Florida, 19 Fed. Reg. 2418, 2424–2425 (Dept. of Agr. Dkt. No. AO–254).

California has a statute similar to the federal law, the California Marketing Act, Cal. Agr. Code §§ 1300.10–1300.29, which allows the Director of Agriculture to promulgate. marketing orders when a majority of the affected handlers or producers assent. *Id.*, § 1300.16.(a).  The purpose of the Act is to restore and maintain adequate purchasing power for California agricultural producers, establish orderly marketing, provide uniform grading, develop new and larger markets and maintain present markets for produce grown within the State, eliminate trade barriers which obstruct the free flow of such produce to the market, and permit the issuance of marketing orders which assure stabilized and orderly distribution of produce. *Id.*, §§ 1300.10, 1300.29; *Brock* v. *Superior Court*, 109 Cal. App. 2d 594, 598, 241 P. 2d 283, 286.  The Director promulgated an avocado marketing order in 1960 and it has been upheld as valid in the state courts. *Child* v. *Warne*, 194 Cal. App. 2d 623, 15 Cal. Rptr. 437.

[6] This is the customary method of administering marketing orders under the Act.  See, *e. g.*; 7 CFR §§ 905.51, 906.39, 907.51, 907.63, 908.51, 908.63, 909.51, 909.52, 910.51, 910.65, 911.51.  In the case of the avocado order, *supra*, note 5, the Department specifically determined that this would be the appropriate method to administer the regulatory program.  19 Fed. Reg., at 2422–2423.

is specifically contemplated in § .51 that such maturity standards be based on a picking-date schedule, and other tests are rejected as unsatisfactory. Section .53 provides that exemption from the regular picking-date regulations of § .51 be allowed for portions of avocado crops of particular varieties when they are proved to be mature prior to the prescribed picking date.[7] All regulated avocados, including those with so-called picking-date exemption certificates, must be inspected by the Federal-State Inspection Service, a United States Department of Agriculture and Florida Department of Agriculture joint service, and be certified as meeting the prescribed quality and maturity standards before they may be marketed. § .54.[8] At various times, other regulations governing Florida avocados have been issued which include more specific quality standards. See 22 Fed. Reg. 6205, 7 CFR §§ 51.3050–51.3053, 51.3058. These quality standards require that the fruit be "mature," for all grades of avocados, but, as in the case of the main order, they do not refer to oil content.[9] Since 1954, each year the Secretary has issued

---

[7] Section .53 provides that such exemption shall be granted under procedural rules approved by the Secretary. Section .52 (b) would appear to provide for review of particular determinations before the Secretary, taken by a party aggrieved thereby or taken by the Secretary *sua sponte*. Exemption under § .53 is allowed only from the picking-date-size standards prescribed under § .51 (a)(1), and not from other regulations such as quality (§ .51 (a)(2)), container and packaging (§ .51 (a)(3)), or grading and labeling (§ .51 (a)(4)). And inspection by the Federal-State Inspection Service for these standards and those set out as the terms and conditions of advance release under § .53 is, of course, required.

[8] Violation of the order is punishable by a fine of from $50 to $500. 7 U. S. C. § 608c (14). Violations of regulations may also be made punishable by the Secretary by a penalty not to exceed $100. 7 U. S. C. § 610 (c).

[9] These regulations and others, 7 CFR §§ 51.3055–51.3069, govern in exhaustive detail the size and shape of avocados, their color, skin condition, stem length, and the manner in which they may be shipped.

maturity regulations fixing the dates when and minimum sizes at which the various varieties of Florida avocados may be packed and shipped.[10] These regulations are recommended by the committee, pursuant to 7 CFR §§ 915.50–915.51, approved by the Secretary after consideration and modification if necessary, 7 CFR § 915.52 (b), and published in the Federal Register, after which they have the force of law. *California Comm'n v. United States*, 355 U. S. 534, 542–543; *Standard Oil Co. v. Johnson*, 316 U. S. 481, 484; *Maryland Cas. Co. v. United States*, 251 U. S. 342, 349.

## II.

The ultimate question for the Court is whether the California law may validily apply to Florida avocados which the Secretary or his inspector says are mature under the federal scheme. We in the minority believe that it cannot, for in our view the California law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U. S. 52, 67.[11]

---

[10] 27 Fed. Reg. 5135–5136, 6705, 8265, 9175, 10091; 26 Fed. Reg. 3692, 4928, 5418–5419, 6429, 7694, 8663; 25 Fed. Reg. 5476, 7712, 8903, 9170, 9888; 24 Fed. Reg. 1152, 3105, 4050, 4828, 5824–5825, 6904, 7354, 8444, 9123, 9262; 23 Fed. Reg. 1025–1026, 4351–4352, 5477, 6318, 7344, 7943, 8047, 9056, 9689; 22 Fed. Reg. 3652, 4251–4252, 5680, 6746, 7173–7174, 7357–7358, 8118; 21 Fed. Reg. 3307–3308, 3488, 6329–6330; 20 Fed. Reg. 3427, 4178–4179; 6699–6700, 7876, 8328–8329, 8688; 19 Fed. Reg. 4404–4405, 4601, 4862, 5469, 5966, 5967, 6368, 6604, 6625, 7477. Similar orders have been issued from time to time concerning maturity of imported avocados. See, *e. g.,* 25 Fed. Reg. 5445; 24 Fed. Reg. 4134, 4829, 5825, 5996; 23 Fed. Reg. 4352, 6027; 22 Fed. Reg. 3957; 21 Fed. Reg. 4257.

[11] "There is not—and from the very nature of the problem there cannot be—any rigid formula or rule which can be used as a universal pattern to determine the meaning and purpose of every act of Congress. This Court, in considering the validity of state laws in the

The central and unavoidable fact is that six out of every 100 Florida avocados certified as mature by federal standards are turned away from the California markets as being immature, and are excluded from that State by the application of a maturity test different from the federal measure. Congress empowered the Secretary to provide for the orderly marketing of avocados and to specify the quality and maturity of avocados to be transported in interstate commerce to any and all markets. Although the Secretary determined that these Florida avocados were mature by federal standards and fit for sale in interstate markets, the State of California determined that they were unfit for sale by applying a test of the type which the Secretary had determined to be unsatisfactory. We think the state law has erected a substantial barrier to the accomplishment of congressional objectives.

We would hesitate to strike down the California statute if the state regulation touched a phase of the subject matter not reached by the federal law and a claim were nevertheless made that such complementary state regulation is preempted, compare *Campbell* v. *Hussey*, 368 U. S. 297, with *Savage* v. *Jones*, 225 U. S. 501. But here the Secretary has promulgated a comprehensive and pervasive regulatory scheme for determining the quality and maturity of Florida avocados, pursuant to the statutory

---

light of . . . federal laws touching the same subject, has made use of the following expressions: conflicting; contrary to; occupying the field; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; and interference. But none of these expressions provides an infallible constitutional test or an exclusive constitutional yardstick. In the final analysis, there can be no one crystal clear distinctly marked formula. Our primary function is to determine whether, under the circumstances of this particular case, Pennsylvania's law *stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."* *Hines* v. *Davidowitz*, 312 U. S. 52, 67. (Emphasis added.) Compare *ante*, p. 141.

mandate to "effectuate orderly marketing of such agricultural commodities." He prescribes in minute detail the standards for the size, appearance, shape, and maturity of avocados. Inspection procedures and, for violation of the regulations, criminal and civil sanctions are provided. No gap exists in the regulatory scheme which would warrant state action to prevent the evils of a no-man's land—at least in relation to the issues presented in this case. Compare *International Union* v. *Wisconsin Board*, 336 U. S. 245, 254. No aspects of avocado maturity are omitted under the federal regulations.[12] Any additional state regulation to "supplement" federal regulation would *pro tanto* supplant it with another scheme, thereby compromising to some degree the congressional policy expressed in the Act.[13]

---

[12] We do not imply that these regulations governing the fitness of avocados in terms of maturity would preclude application of local regulations concerning, for example, bacteria content or DDT content. Cf. *Huron Co.* v. *Detroit*, 362 U. S. 440. Neither health regulation nor safety considerations, cf. *Lyons* v. *Thrifty Drug Stores Co.*, 105 Cal. App. 2d 844, 234 P. 2d 62, are involved in this case. And there is no finding that there is anything fraudulent, deceptive, or unmarketable about a Florida avocado which is mature enough to be introduced into interstate commerce under a federal certificate evidencing its quality. Compare *Plumley* v. *Massachusetts*, 155 U. S. 461, 472, quoted *ante*, p. 144.

[13] It was suggested that there is a gap in the federal scheme through which immature avocados may enter commerce bearing an exemption certificate issued "seemingly . . . in the unfettered discretion of the growers' own Committee." This contention omits the requirement of § .53 that exemption from the normal picking-date-size provisions be allowed only to avocados inspected and proved mature because they satisfied special maturity tests prescribed under procedures approved by the Secretary, and the fact that such avocados carry a federal certificate as to maturity and quality. It also omits the Secretary's general review power over regulatory determinations provided by § .52 (b). No contention has been made that actual abuses have occurred under the exemption certificate provisions nor has any basis upon which they may be anticipated been suggested.

By contrast, in *Parker* v. *Brown,* 317 U. S. 341, upon which appellees seek to rely, the federal agricultural regulatory scheme was partial and incomplete. It was contended that § 8c of the Agricultural Adjustment Act, by its own force, preempted application of the California Agricultural Prorate Act. The Court held that since no marketing order concerning the affected commodities had been promulgated under § 8c, and since the Act's policies therefore must be deemed by the Secretary not to be effectuated by entry into the field, it followed that there was no preemption: "It is evident, therefore, that the Marketing Act contemplates the existence of state programs at least until such time as the Secretary shall establish a federal marketing program . . . ." *Id.,* at 354.[14] In the case at bar, of course, the Secretary has entered the field with his own comprehensive regulatory program with which the state program conflicts.

Nor does the California statute further a distinctive interest of the State different from the one which the federal scheme protects. Compare *Huron Co.* v. *Detroit,* 362 U. S. 440; *Union Brokerage Co.* v. *Jensen,* 322 U. S. 202. There is no health interest here. The question

---

[14] It also came out, by representation of the Solicitor General as *amicus curiae* before this Court, that the Department of Agriculture had collaborated in drafting the state raisin program; and had taken other actions which "must be taken as an expression of opinion by the Department of Agriculture that the state program . . . is consistent with the policies of the Agricultural Adjustment and Agricultural Marketing Agreement Acts." *Id.,* at 358. Hence, in holding "We find no conflict between the two acts [state and federal] and no such occupation of the legislative field by the mere adoption of the . . . [federal] Act, without the issuance of any order by the Secretary putting it into effect, as would preclude the effective operation of the state act," the Court expressly declared, "We have no occasion to decide whether the same conclusion would follow if the state program had not been adopted with the collaboration of officials of the Department of Agriculture . . . ." *Id.,* at 358.

is, as the District Court recognized, 197 F. Supp., at 782–783, a purely economic one: the marketing of immature avocados, which do not ripen properly after purchase by the consumer but instead shrivel up and decay, has a substantial adverse effect on consumer demand for avocados. According to the testimony of appellees' expert from the California Department of Agriculture, § 792 was "deemed to be necessary by representatives in the industry due to deplorable marketing conditions"—the sale of immature avocados, which was severely "damaging the reputation of the industry by providing consumers with undesirable avocado fruits." Despite the repeated suggestions to this effect in the Court's opinion, there is no indication that the state regulatory scheme has any purpose other than protecting the good will of the avocado industry—such as protecting health or preventing deception of the public—unless as a purely incidental by-product. Similar findings on damage to the industry because some growers marketed immature avocados are contained in the United States Department of Agriculture order which preceded the issuance of the federal regulations. 19 Fed. Reg., at 2419, 2424. These two regulatory schemes have precisely the same purpose, which is purely an economic one; they seek to achieve it, however, by applying different tests to the same avocados.

We also believe that the purpose and objective of Congress and of the marketing order promulgated under its authority call for the application of uniform standards of quality, even absent the total occupation of the field by the federal regulatory scheme. See *Guss* v. *Utah Board,* 353 U. S. 1; *Gibbons* v. *Ogden,* 9 Wheat. 1. Lack of uniformity tends to obstruct commerce, to divide the Nation into many markets. When produce is accepted or rejected in different localities depending upon local vagaries, the flow of commerce is inevitably interrupted, hindered, and diminished. In recognition of this need for uni-

formity, Congress stated at the outset of the Agricultural Adjustment Act:

> "It is declared that the disruption of the orderly exchange of commodities in interstate commerce . . . destroys the value of agricultural assets which support the national credit structure . . . and burden[s] and obstruct[s] . . . commerce.

> "It is declared to be the policy of Congress . . . to establish and maintain such minimum standards of quality and maturity and such grading and inspection requirements for agricultural commodities . . . as will effectuate . . . orderly marketing . . . ." §§ 1, 2, 7 U. S. C. §§ 601, 602.

The language of the statute is buttressed by the Committee Reports, H. R. Rep. No. 1241, 74th Cong., 1st Sess., at 22; S. Rep. No. 1011, 74th Cong., 1st Sess., at 15, where it is said in explanation of § 10 (i) that the Secretary is authorized to negotiate with state authorities in order to secure their voluntary compliance in carrying out the declared policy of the Act of uniformity of regulatory programs.

The contention is made that § 8c (11) negatives the policy declaration that uniformity is sought by the Act. That section directs the Secretary to issue orders limited to as small a geographic region as practicable in order to insure that due recognition be accorded to local conditions of soil, climate, and the like. This provision recognizes that while uniformity at the market-end of the flow of commerce may be necessary to prevent burdens on commerce in produce, nationwide uniformity may be neither necessary nor desirable at the production-end of the flow of commerce. It may be, as the Court suggests, that the Secretary might find for other avocado growing regions, if there were any, that different tests furnished the most convenient index of maturity for those avocados. But it

does not follow from this premise that the statutory scheme will permit equally varied standards in the Nation's various market places. Section 8c (11) does not contemplate such regional variations nor would they comport with the statutory purpose. It may not obstruct or burden commerce to admit avocados into commerce on diverse bases in different parts of the country; any individual grower in that situation would face but one standard. But it does burden commerce and frustrate the congressional purpose when each grower faces different standards in different markets. To slip from permissible nonuniformity at one end of the stream of commerce to permissible nonuniformity at the other end thus is to read the statute too casually and gloss over the congressional purpose, which expressly was to facilitate marketing in and transportation to "any and all markets in the current of interstate commerce."

It is also suggested that the use of the term "minimum standards" indicates a lack of desire for uniformity. This reads too much into a phrase, for it is a commonplace that when the appropriate federal regulatory agency adopts minimum standards which on balance satisfy the needs of the subject matter without disproportionate burden on the regulatees, the balance struck is not to be upset by the imposition of higher local standards. See for example *Southern R. Co.* v. *Railroad Comm'n,* 236 U. S. 439. And when the cumulative operation of more strict local law is to be continued in such circumstances, despite the congressional balance struck, Congress has so provided in express terms. For example, in *Rice* v. *Board of Trade,* 331 U. S. 247, 255, it was noted that the federal statute provided that "nothing in this section or section 4b shall be construed to impair any State law applicable to any transaction enumerated or described in such sections." See, to the same effect, *Plumley* v. *Massachu-*

*setts,* 155 U. S. 461; *Cloverleaf Co.* v. *Patterson,* 315 U. S. 148, 161–162.

Nothing in the Act, marketing order, or legislative history shows any congressional intention to accommodate or permit state controls inconsistent with federal law or marketing orders issued thereunder. The authorization contained in § 10 (i) to seek the cooperation of state authorities in pursuit of the goal of uniform standards of quality and maturity carries no implication that state standards contrary to the federal are to stand. The Secretary was not directed to defer to any State. The fact is that he did work out a cooperative scheme with the State of Florida where the avocados involved in this case are grown. These avocados, which California rejected, were jointly inspected by federal and state authorities applying the same standards in order to move mature avocados into the stream of interstate commerce. To read into an authorization to the Secretary to cooperate with the States a direction that he cooperate with, or that his regulatory scheme defer to, not only the State directly affected by a marketing order but every other State in which avocados might be sold would clearly frustrate the federal purpose of the orderly marketing of avocados in interstate commerce.

We would not, as appellees would have it and as the majority appears to suggest, construe § 10 as limiting the power of the Secretary under § 608c to the issuance of marketing orders which are complementary to and not inconsistent with state regulation.[15] The suggestion that

[15] We note that § 1300.24 (b) of the California Agricultural Code contains a provision similar to federal § 10 (i):

"The director is hereby authorized to confer with and cooperate with the legally constituted authorities of other States and of the United States, for the purpose of obtaining uniformity in the administration of Federal and State marketing regulations, licenses or orders, and

the Secretary cooperate with the States should be viewed as was a very similar authorization to the same government official in *Rice* v. *Chicago Board of Trade,* 331 U. S. 247. There the statute provided that the Secretary of Agriculture "may cooperate with any department or agency of the Government, any State . . . or political subdivision thereof." A unanimous Court remarked that this provision supported "the inference that Congress did not design a regulatory system which excluded state regulation not in conflict with the federal requirements," but it was careful to note that "it would be quite a different matter if the Illinois Commission adopted rules for the Board which either violated the standards of the Act or collided with rules of the Secretary."

The conflict between federal and state law is unmistakable here. The Secretary asserts certain Florida avocados are mature. The state law rejects them as immature. And the conflict is over a matter of central importance to the federal scheme. The elaborate regulatory scheme of the marketing order is focused upon the problem of moving mature avocados into interstate commerce. The maturity regulations are not peripheral aspects of the federal scheme. Compare *International Assn. of Machinists* v. *Gonzales,* 356 U. S. 617. On the contrary, in the Department of Agriculture order which

said director is authorized to conduct joint hearings, issue joint or concurrent marketing orders, for the purposes and within the standards set forth in this act, and may exercise any administrative authority prescribed by this act to effect such uniformity of administration and regulation."

Under the reasoning suggested to us the California law should be construed not to apply to Florida avocados marketed under a federal order. And see *Oil Workers Union* v. *Missouri,* 361 U. S. 363, 370; *Allen-Bradley Local* v. *Wisconsin Board,* 315 U. S. 740, 746; *Pearson* v. *Probate Court,* 309 U. S. 270, 277; *Carey* v. *South Dakota,* 250 U. S. 118, 122.

preceded issuance of the avocado regulations, it was found that the marketing of immature avocados was one of the principal problems, if not the principal problem, faced by the industry and that these regulations should be adopted to solve this problem which was demoralizing the industry. 19 Fed. Reg., at 2419, 2424.[16] The conflict involved in this case therefore cannot properly be deemed "too contingent, too remotely related to" (356 U. S., at 621) the policy and purpose of the Act to call for requiring the inconsistent state scheme to defer or be accommodated to the federal one.

California nevertheless argues that it should be permitted to apply its oil test cumulatively with the federal test to insure that only mature avocados are offered in its markets. The Court accepts this contention as "a well-settled proposition," in the name of *Cloverleaf Butter Co.* v. *Patterson,* 315 U. S. 148, and the uncited "all the authorities," which appear to be nonexistent, *ante,* p. 144 and n. 13. There are at least three answers to this contention.[17] First, it ignores the limitations of the 8% oil test as applied to the inherently less oily Florida avocados, which the District Court indicated were "acceptable prior to the time that they reach that content." As applied to California avocados, the 8% oil figure leaves an ample tolerance for individual variation, but it is otherwise as applied to the less oily Florida varieties. Second, if the argument is that the federal test is unsatisfactory and that the California test is a better one—as it would appear to be in view of the reliance on "a higher stand-

---

[16] "Probably the most important single factor of quality is that of maturity." 19 Fed. Reg., at 2424.

[17] To the extent that this contention is to be understood to be limited to "all the authorities" supporting "a higher standard for *consumers,*" we have already indicated, pp. 168–169, *supra,* that the California law is not aimed at consumer protection but at avocado grower protection.

ard," which in this case means only a more accurate standard because no one asserts that some avocados can be less highly mature than others and therefore ripen less fully—it must be remembered that the Secretary, to whom Congress delegated its power, made a legislative finding in his order adopting the picking-date-size method of determining maturity and specifically rejecting physical chemical tests of the California type. That finding cannot be impeached collaterally in this proceeding. Adopting one maturity test rather than another "is a legislative not a judicial choice" and its validity "is not to be determined by weighing in the judicial scales the merits of the legislative choice and rejecting it if the weight of evidence presented in court appears to favor a different standard." *South Carolina Highway Dept.* v. *Barnwell Bros.,* 303 U. S. 177, 191. See *Security Administrator* v. *Quaker Oats Co.,* 318 U. S. 218; *United States* v. *Carolene Products Co.,* 304 U. S. 144. Neither California nor this Court has any place second-guessing the wisdom of Congress or its delegate. Third, Congress did not limit its interest to the picking of avocados, nor even to their transportation in commerce to markets in other States. It expressly declared its intention to regulate the maturity and quality of produce "which may be marketed in . . . any and all interstate markets." Congress sought to regulate marketing from the beginning through the end of the stream of commerce, in order to eliminate impediments at any part of that stream. The Court ignores the plain words of the statute in concluding that the California law does not frustrate the federal scheme.

Even if the California oil test were an acceptable test for the maturity of the Florida avocados, which the Secretary found it was not, the cumulative application of that test solely for the purpose of a second check on the maturity of Florida avocados, solely to catch possible errors in the federal scheme, would prove only that the particular

avocados actually tested (and thereby destroyed) were immature, and it would not justify the rejection of whole lots from which these samples came. If Florida avocados are to be subjected to this test, the alternatives are to leave the California market to the California producers (at least, to producers of Mexican varieties) or else, in order to avoid the hazard of rejection, to leave the Florida avocados on the trees past the normal (and federally prescribed) picking date, thereby shortening the post-picking marketing period and thus frustrating the federal scheme aimed at moving avocados mature under federal standards into all interstate markets.[18] A reasonable balancing of the state and federal interests at stake here requires that the former give way as too insubstantial to warrant frustration of the congressional purpose.

We have, then, a case where the federal regulatory scheme is comprehensive, pervasive, and without a hiatus which the state regulations could fill. Both the subject matter and the statute call for uniformity. The conflict is substantial—at least six out of every 100 federally certified avocados are barred for failure to pass the Colifornia test [19]—and it is located in a central portion of the federal

---

[18] The avocado may remain hard and in perfect condition on the tree for some time after reaching maturity, for the fruit does not soften until after it is picked. But the harvesting and shipping of fruit which has reached the fullest possible degree of maturity on the tree is not recommended. The seed may sprout while the fruit is on the tree or the fruit may ripen so rapidly after harvesting that it cannot be shipped satisfactorily. Ruehle, The Florida Avocado Industry, 70 (Univ. of Fla. Agr. Expt. Sta. Bull. No. 602, 1958); Wolfe, Toy and Stahl, Avocado Production in Florida, 83 (Ruehle rev. ed., Fla. Agr. Ext. Serv. Bull. No. 141, 1949).

[19] There is no indication in the record as to how many Florida avocados are kept out of the California market by the prudence of growers and handlers who voluntarily avoid the risks of the California oil test. Nor are we advised as to whether other States have

scheme. The effect of the conflict is to disrupt and burden the flow of commerce and the sale of Florida avocados in distant markets, contrary to the congressional policy underlying the Act. The State may have a legitimate economic interest in the subject matter, but it is adequately served by the federal regulations and this interest would be but slightly impaired, if at all, by the supersession of § 792.[20]

In such circumstances, the state law should give way; it "becomes inoperative and the federal legislation exclusive in its application." *Cloverleaf Co. v. Patterson,* 315 U. S. 148, 156. Accord, *McDermott v. Wisconsin,* 228 U. S. 115; *Hill v. Florida,* 325 U. S. 538. The conclusion is inescapable that the California law is an obstacle to the accomplishment and execution of the congressional purposes and objectives, and that the California law and

---

adopted avocado legislation, so that the cumulative burden on commerce is further increased. In any event, 6% is a not insubstantial figure in terms of restraints upon commerce.

[20] It is suggested that the regulations involved here are "simply schemes for regulating competition among growers . . . initiated and administered by the growers and shippers themselves." From this proposition it is in some way reasoned that "the self-help standards of this marketing program" should not be deemed to preclude application of state law which conflicts with and interferes with the operation of the comprehensive federal marketing program. The "simply" part of the proposition overlooks, however, the fact that these are the *Secretary's* regulations, promulgated under congressional authority. It also overlooks the Secretary's extensive supervisory powers and his statutory duty under 7 U. S. C. § 602 (3) to insure that regulations be carried on "in the public interest." And no case has been cited to us which indicates that the delegation to the regulatees of the power to propose regulations in the first instance violates any provision of general law. See *Parker v. Brown,* 317 U. S. 341, 352; *Sunshine Anthracite Co. v. Adkins,* 310 U. S. 381; *United States v. Rock Royal Co-op.,* 307 U. S. 533, 577–578; *Currin v. Wallace,* 306 U. S. 1, 16; *Johnson Co. v. Securities & Exchange Comm'n,* 198 F. 2d 690, 695 (C. A. 2d Cir.).

the Agricultural Adjustment Act, as supplemented by the regulations promulgated thereunder, cannot be reconciled and cannot consistently stand together.[21] The Court should not allow avocados certified as mature under the federal marketing order to be embargoed by any State because it thinks that they are immature. We would therefore reverse with instructions to grant the injunction requested.

[21] And see *Castle* v. *Hayes Lines, Inc.,* 348 U. S. 61; *First Iowa Coop.* v. *Federal Power Comm'n,* 328 U. S. 152; *Gibbons* v. *Ogden,* 9 Wheat. 1; *Dumont Labs.* v. *Carroll,* 184 F. 2d 153 (C. A. 3d Cir.). The suggestion, *ante,* p. 141, that the doctrine of *Gibbons* v. *Ogden* is limited to carriers is unwarranted in view of such cases as *First Iowa.*