MASSACHUSETTS ASSOCIATION OF HEALTH MAINTENANCE ORGA-NIZATIONS, Plaintiff, Appellee,

v.

Linda RUTHARDT, Commissioner of Insurance, Defendant, Appellant.

No. 99–1133.

United States Court of Appeals, First Circuit.

Heard Sept. 13, 1999.

Decided Oct. 8, 1999.

Thomas A. Barnico, Assistant Attorney General, Commonwealth of Massachusetts, with whom Thomas F. Reilly, Attorney General, was on brief, for appellant.

Clare D. McGorrian and Health Law Advocates on brief for Mass. Senior Action Council, Health Care for All, Inc., Disability Law Center, Gerontology Institute of the University of Mass.-Boston, Center for Medicare Advocacy, Alzheimer's Disease and Related Disorders Ass'n of Eastern Mass., and AIDS Action Committee of Mass., amici curiae.

John T. Montgomery, with whom Richard S. Weitzel and Ropes & Gray were on brief, for appellee.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and LIPEZ, Circuit Judge.

SELYA, Circuit Judge.

The Commonwealth of Massachusetts requires organizations that offer Medicare beneficiaries supplemental health care insurance to provide full prescription drug coverage. When the federal government enacted legislation that imposed its own imperatives on such organizations, an association of health care providers sought a declaration that the federal scheme preempted the Massachusetts drug-benefit directive. The United States District Court for the District of Massachusetts, ruling *ore tenus,* found preemption. We affirm.

## I. BACKGROUND

If social programs are meant to furnish a safety net, Medicare is a notoriously porous one. A main cause of this porosity is that most outpatient prescription drugs are not covered. As a result, Medicare beneficiaries who desire such coverage must either purchase supplemental private insurance or enroll in a health maintenance organization (HMO). For many years, Massachusetts HMOs, like their counterparts elsewhere, offered benefit options ranging from no coverage for prescription drugs to full coverage. Then, in a bold stroke designed to improve health care for the elderly and disabled, the Massachusetts legislature passed a law commanding all supplemental providers to offer at least one plan that includes unlimited outpatient prescription drug coverage. *See* Mass. Gen. Laws Ann. ch. 176K (West 1998) (effective Jan. 14, 1994); Mass. Regs.Code tit. 211, § 71.23 (1998) (effective Jan. 1, 1995).

The Medicare program, 42 U.S.C. §§ 1395–1395ggg (1999), remains a work in progress. Since its inception in 1965, Congress has made countless modifications to it. Continuing in this mode, Congress, as part of the fiscal 1997 budget bill, estab-

lished the **Medicare + Choice** Program (the Program). *See* Balanced Budget Act of 1997(BBA), Pub.L. No. 105–33 § 4001, 111 Stat. 251, 275–328 (codified at 42 U.S.C. §§ 1395w–21 to w–28). Participation in the Program is conditioned on providers offering basic Medicare benefits, meeting certain other statutorily defined criteria, and neither charging more in premiums nor furnishing less in supplemental benefits than the levels established through regulation by the Secretary of Health and Human Services (the Secretary). *See* 42 U.S.C. §§ 1395w–22, w–24, w–25, w–26.

The BBA includes the following provisions discussing the Program's preemptive effect:

**(b) Establishment of other standards**

  .       .       .       .       .

**(3) Relation to state laws**

**(A) In general**

The standards established under this subsection shall supersede any State law or regulation (including standards described in subparagraph (B)) with respect to Medicare + Choice plans which are offered by Medicare + Choice organizations under this part to the extent such law or regulation is inconsistent with such standards.

**(B) Standards specifically superseded**

State standards relating to the following are superseded under this paragraph:

**(i)** Benefit requirements.

**(ii)** Requirements relating to inclusion or treatment of providers.

**(iii)** Coverage determinations (including related appeals and grievance processes).

*Id.* § 1395w–26.

In April 1998, the Massachusetts Commissioner of Insurance (the Commissioner), undaunted by the BBA, announced that the Commonwealth would continue to require supplemental providers to offer full prescription drug coverage. *See* Bulletin No. 98–03 (Apr. 17, 1998). In June 1998, the Secretary published an interim final rule interpreting subparagraph (B) of section 1395w–26 to nullify state benefit requirements (even those that are not inconsistent with federal standards). *See* 63 Fed.Reg. 34,968, 35,099 (June 26, 1998) (codified at 42 C.F.R. § 422.402 (1998)). This rule remains in effect. *See* 64 Fed. Reg. 7968 (Feb. 17, 1999). Massachusetts promptly proclaimed that it would defy the federal regulation and continue to enforce its drug-benefit requirement "absent a judicial determination that any state law is preempted." Bulletin No. 98–07 (July 20, 1998).

The Commonwealth's intransigence led the Massachusetts Association of HMOs (the Association) to seek a declaration that the BBA and the Secretary's rule preempt the Commonwealth's full drug coverage requirement. The federal district court obliged. The Commissioner appeals.

## II. ANALYSIS

We begin by mapping the legal terrain and then turn to the topography of the case at hand.

### A. *An Overview.*

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. By virtue of this commandment, state law that conflicts with federal law is a nullity. *See Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981); *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 210–11, 6 L.Ed. 23 (1824); *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427, 4 L.Ed. 579 (1819); *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 822 (1st Cir.1992).

■■■ Preemption is strong medicine. Thus, although the power to preempt is

absolute, its exercise is not lightly to be presumed. *See Gregory v. Ashcroft*, 501 U.S. 452, 460, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). Rather, courts "start with the assumption that the historic police powers of the States [are] not to be superseded by ... Federal Act unless that [is] the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947). It follows inexorably that congressional intent stands at the base of all preemption analysis. *See Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).

■ The Supreme Court generally distinguishes between express and implied theories of preemption. Express preemption occurs "when Congress has 'unmistakably ... ordained' that its enactments alone are to regulate a [subject, and] state laws regulating that [subject] must fall." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977) (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963)). Implied preemption is more elusive; that concept "has a certain protean quality, which renders pigeonholing difficult." *French v. Pan Am Express, Inc.*, 869 F.2d 1, 2 (1st Cir.1989). Generally speaking, implied preemption encompasses both "field" and "conflict" preemption principles. The former set of principles reflects the view that Congress's intent to occupy a given field can be inferred from the pervasiveness of federal regulation and/or the dominance of the federal interest in a particular area of legislative activity. *See Rice*, 331 U.S. at 230, 67 S.Ct. 1146; *French*, 869 F.2d at 2.

By contrast, the latter set of principles reflects the idea that congressional intent also can be deduced from circumstances such as inconsistency or impossibility.[1] *See Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) (plurality op.).

■ The Court recently offered additional guidance on the proper approach to statutes that include explicit preemption language. In *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996), the Justices explained that although an express preemption clause may indicate congressional intent to preempt "at least some state law," courts nonetheless must "identify the domain expressly pre-empted by that language." *Id.* at 484, 116 S.Ct. 2240 (citation and internal quotation marks omitted). Two presumptions inform the process of determining the scope of an express preemption clause. First, the familiar assumption that preemption will not lie absent evidence of a clear and manifest congressional purpose must be applied not only when answering the threshold question of whether Congress intended *any* preemption to occur, but also when measuring the reach of an explicit preemption clause. *See id.* at 485, 116 S.Ct. 2240. Second, while the scope determination must be anchored in the text of the express preemption clause, congressional intent is not to be derived solely from that language but from context as well. *See id.* at 486, 116 S.Ct. 2240 (acknowledging as "relevant" data "the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress

---

**1.** While the two categories of implied preemption regularly overlap, the boundary between express and implied preemption tends to be strictly observed. The main reason for this separation is that when a statute contains an express preemption clause, judicial inquiry almost always begins and ends with the text of that provision. *See, e.g., Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484–85, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996); *Cipollone*, 505 U.S. at 517, 112 S.Ct. 2608; *Greenwood Trust*, 971 F.2d at 823. A recent case, however, calls this truism into question. *See Boggs v. Boggs*, 520 U.S. 833, 841, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997) (deciding that ERISA preempts conflicting state law, but not relying on ERISA's express preemption clause to reach that result). Because we find that the express preemption clause of the BBA controls here, *see* text *infra*, we need not consider whether *Boggs* represents a ground swell or a hiccough.

intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law" (citations and internal quotation marks omitted)); *accord California Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 284, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987) (explaining that, in such circumstances, a court "must examine the [act's] language against the background of its legislative history and historical context").

## B. *The Merits.*

Against this legal landscape, we turn to the merits. Our review is plenary. *See Philip Morris Inc. v. Harshbarger,* 122 F.3d 58, 62 (1st Cir.1997).

### 1.

On its own, section 1395w–26(b)(3)(B) appears to reflect an unqualified congressional desire to preempt state standards relating to, inter alia, benefit requirements. The following excerpt drives the point home:

> State standards relating to the following are superseded under this paragraph:
>
> **(i)** Benefit requirements.
>
> **(ii)** Requirements relating to inclusion or treatment of providers.
>
> **(iii)** Coverage determinations (including related appeals and grievance processes).

Noting that the Commissioner does not dispute that the Massachusetts law and regulation mandating a full prescription drug coverage option are "state standards relating to ... benefit requirements," the Association invites us to declare that the quoted passage ends the matter.

We decline the Association's invitation to read subparagraph (B) as an entirely free-standing statutory provision for two reasons. For one thing, the text of the subparagraph includes the phrase "under this paragraph." The Association attempts to slough off these words as "nothing more than a drafting formality, akin to stating 'hereunder,'" and optimistically suggests that the phrase refers only to the paragraph's title ("Relation to state laws") and not to the conjoined subparagraphs that together constitute "this paragraph." Appellee's Brief at 24 n. 5. Although it is true that courts sometimes rely on the titles of statutory enactments in plumbing their meaning, *see, e.g., United States v. Chapman,* 60 F.3d 894, 897–98 (1st Cir. 1995), that practice should not be indulged at the expense of the text itself. For another thing, even if subparagraph (B) included no external referent, we would consider ourselves obliged to examine the statutory provision in context. *See Medtronic,* 518 U.S. at 486, 116 S.Ct. 2240; *see also O'Connell v. Shalala,* 79 F.3d 170, 176 (1st Cir.1996) (warning that statutory construction should never proceed by "focus[ing] with Cyclopean intensity" on a single provision).

What, then, does it mean to be "superseded under this paragraph"? The Commissioner accurately observes that the paragraph includes subparagraph (A), which provides:

> The standards established under this subsection shall supersede any State law or regulation **(including standards described in subparagraph (B))** with respect to Medicare + Choice plans which are offered by Medicare + Choice organizations under this part to the extent such law or regulation is inconsistent with such standards. [Emphasis supplied.]

From the parenthetical reference to subparagraph (B), the Commissioner deduces that subparagraph (A) circumscribes the preemptive scope of subparagraph (B) by applying a conflict preemption regime to *all* state standards, including those that relate to benefit requirements. Because Massachusetts law insists upon *additional* benefits, her thesis runs, it is not inconsistent with federal law. *See, e.g.,* 42 U.S.C. § 1395w–22(a)(1)(B) (mandating that **Medicare + Choice** plans shall provide additional benefits required under section

1395w–24(f)(1)(A)); *id.* § 1395w–24(f)(1)(E) (clarifying that nothing in subsection 1395w–24(f) shall be construed as preventing organizations from providing supplemental benefits described in section 1395w–22(a)(3)); *id.* § 1395w–22(a)(3)(C) (similarly emphasizing that organizations may provide additional benefits).[2] Thus, the Commonwealth's ukase should be allowed to operate *ex proprio vigore.*

The Commissioner's interpretation possesses a patina of plausibility. In the last analysis, however, it would diminish subparagraph (B) to a list of examples—a role that the text and context of the subparagraph belie. This subparagraph declares that certain state standards "are" superseded under the paragraph; it does not intimate that these standards "may" be preempted if the Secretary promulgates particular types of regulations. As a general matter, we are loath to reduce statutory language to a merely illustrative function, and the language of this subparagraph does not readily invite a departure from that norm. This is particularly true when we recollect that "[a]ll words and provisions of statutes are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant or superfluous." *United States v. Ven–Fuel, Inc.,* 758 F.2d 741, 751–52 (1st Cir.1985). Though a list of examples is not necessarily superfluous—Congress may consider a specific point important or uncertain enough to justify a modicum of redundancy—the surrounding statutory framework compels a finding of superfluity in the case of subparagraph (B). In the same subsection, the Secretary is enjoined to "establish by regulation ... standards ... for Medicare + Choice organizations and plans ... to carry out this part," 42 U.S.C. § 1395w–26(b)(1), and the subject areas enumerated in subparagraph (B) are unquestionably central to the **Medicare + Choice** pro-

gram, *see, e.g., id.* § 1395w–22 ("Benefits and beneficiary protections"); *id.* § 1395w–22(f) ("Grievance mechanism"); *id.* § 1395w–22(g) ("Coverage determinations, reconsiderations, and appeals"). In this context, it strains credulity to suppose that, absent this cryptic parenthetical, the Secretary would overlook the need for regulation in these vital areas.

Withal, the rule against superfluity can be a double-edged interpretive sword. Were the parenthetical in subparagraph (A) otherwise inexplicable, we would be faced with an unhappy choice between nullifying the parenthetical or reducing subparagraph (B) to mere window-dressing. Ordinary prudence, then, counsels in favor of searching the full paragraph's text and the surrounding statutory framework to see whether they collectively suggest a more substantive role for subparagraph (B), consistent with the odd parenthetical that appears in subparagraph (A). To this end, we mull three theories that the Association hawks.

The district court embraced the first of the Association's theories: that the parenthetical simply authorizes the Secretary to promulgate, among other standards, regulations pertaining to the subject areas specifically preempted by subparagraph (B). On this reasoning, subparagraph (A) describes the manner in which state standards are preempted by federal regulations, whereas subparagraph (B) declares that certain state standards are specifically superseded by the BBA itself. This hypothesis fails because it depends on the faulty assumption that the Secretary is blind to the rest of the statute. After all, the parenthetical is not the source of the Secretary's rulemaking authority in these areas; section 1395w–26(b)(1) fills that role.

What is more, subparagraph (B) would represent a curious placement for a provi-

---

**2.** *But see* 42 U.S.C. § 1395w–22(a)(3)(A) (providing that the Secretary shall approve supplemental benefits unless she determines that such benefits would "substantially discourage" **Medicare + Choice** enrollment).

sion describing the preemptive effect of the BBA itself. The subparagraph provides that certain state standards are superseded "under this paragraph"—not "under this part"—and the relevant paragraph appears in a subsection that orders the Secretary to establish standards by regulation. A far more logical location for an announcement of the BBA's preemptive effect would be section 1395w–22, which outlines the statutory benefit requirements for **Medicare + Choice** plans.[3] For these reasons, we reject the Association's first theorem.

The Association's remaining two theories are: (1) that the parenthetical informs the Secretary that she has interpretative authority to determine whether a particular state standard falls into one of the categories enumerated in subparagraph (B); and (2) that it puts the Secretary on notice that certain types of state laws are deemed per se to clash with her regulations (should she promulgate any). At first blush, both of these attributions may seem extraneous. Subparagraph (B) is obviously within the "part" which the Secretary is instructed to implement via regulation, *see* 42 U.S.C. § 1395w–26, and one might think it equally obvious that the Secretary's power extends to subparagraph (B) itself. But that glib conclusion overlooks that the presumption against preemption applies to the task of defining the scope of an express preemption clause. *See Medtronic*, 518 U.S. at 485, 116 S.Ct. 2240. Hence, the general delegation provision in paragraph (1) may not by itself resolve the potential deadlock between the presumption and the need for deference to agency expertise. *See Chevron U.S.A. Inc. v. Natural Resources Defense Coun-*

cil, *Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see generally* Jack W. Campbell IV, *Regulatory Preemption in the Garcia/Chevron Era*, 59 U. Pitt. L.Rev. 805 (1998).

This brings us to *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 743–44, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996), in which the Court unanimously held that deference to a regulation that defines an ambiguous term in a substantive statutory provision is appropriate, even though the effect is to preempt state law. The *Smiley* Court distinguished *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992), on the ground that the issue there involved the meaning of an express preemption clause. *See Smiley*, 517 U.S. at 744, 116 S.Ct. 1730. Thus, *Smiley* left open the question of what happens when the strong centrifugal force of deference to an agency's interpretation of an express preemption clause comes into contact with the strong centripetal force of the presumption against preemption.

The intervening decision in *Medtronic* only complicates matters. There, five Justices accorded what appears to be an intermediate level of deference to an agency's interpretation of the scope of an express preemption provision. *See Medtronic*, 518 U.S. at 496, 116 S.Ct. 2240 (according the agency's interpretation "substantial weight"); *id.* at 505–06, 116 S.Ct. 2240 (Breyer, J., concurring) (allowing the agency a "degree of leeway").[4] Against the backdrop of this doctrinal uncertainty, the parenthetical here may well indicate that Congress intended the Secretary's regulations, including those designed to delineate the reach of subparagraph (B), to warrant at least some measure of deference, the

---

**3.** In point of fact, an earlier House version of section 1395w–22 included a non-preemption clause in that section, *see* H.R.2015, 105th Cong. § 4001 (section 1852(n)), *reprinted in* 143 Cong. Rec. H4416, H4441 (daily ed. June 25, 1997), but this provision was omitted from the conference agreement, *see* H.R. Conf. Rep. No. 105–217, at 611, *reprinted in* 1997 U.S.C.C.A.N. 176, 231–32. We will have more to say later about the meaning of this decision. For now, it suffices to remark

that there was an obvious alternative location for a clause designed to declare the statute's preemptive effect.

**4.** The remaining Justices took no position on this issue, finding the relevant statutory language clear and any deference therefore inappropriate. *See Medtronic*, 518 U.S. at 512, 116 S.Ct. 2240 (O'Connor, J., dissenting).

non-preemption presumption notwithstanding.

Although this distinction seems plausible, we need not rest our decision on it. The Association says that the most logical purpose of the parenthetical is to put the Secretary on notice that state standards in particular areas create a per se conflict with federal regulation. On its own, this proposed function merely restates the argument's conclusion. If subparagraph (B) clearly provides for the automatic preemption of state law in the three listed categories, then it affords ample notice to the Secretary without recourse to (or need for) the parenthetical in subparagraph (A). Despite this deficiency, however, the appellee's argument contains a solid kernel of truth. The important idea is not notice but, rather, the implied suggestion of a special category of inconsistency. Recognizing this fact brings the most natural reading of subparagraph (B) and the earlier parenthetical into focus, and supplies the last piece of the interpretive puzzle.

We believe that paragraph (3) as a whole concerns the relationship between federal regulations and state criteria. This follows from the placement of the paragraph in a section that deals with the establishment of standards by the Secretary, not in the section containing the relevant self-executing provisions. As part of this construct, subparagraph (A) provides a general rule of conflict preemption that (as the parenthetical and title ["In general"] make clear) applies universally—that is, all state standards are preempted to the extent they are inconsistent with federal regulations.

Subparagraph (B) goes a step further. It says in unqualified terms that state standards relating to three enumerated areas "are superseded under this paragraph." In context, we think this means that state standards concerning these three enumerated areas are deemed to be per se inconsistent with any federal regulation. This taxonomy makes sense when one considers the centrality of the enumerated areas vis-à-vis the **Medicare + Choice** program. Subparagraph (B) thus makes explicit what might well have been implied: the anticipation that, once promulgated, federal regulations will dominate these particular fields, leaving no room therein for state standard-setting.

The distinction between this interpretation and the theory advanced by the Association, as we parse the statutory scheme, is that state standards in the three enumerated areas are not expressly preempted unless and until the Secretary triggers preemption by promulgating regulations.[5] This makes sense in light of the intentionally skeletal nature of the statute. Congress, in the midst of enacting a massive budget bill, chose not to limn the exact parameters of a complex new program. Instead, it provided the ossature and left the Secretary the duty of adding flesh and sinew by regulation. Perhaps Congress believed that to preempt state law before the Secretary made the Program's corpus complete would have been premature.[6] In all events, once the Secretary established regulations pursuant to subsection (b)—as she has done, see 42 C.F.R. pt. 422—the Commonwealth's requirement that supplemental health care providers must offer full prescription drug coverage became ineffectual.

There is a final and decisive textual argument, not made by the parties or the amici. Paragraph (1) of section 1395w-25(a) requires **Medicare + Choice** organi-

---

5. This may explain why the conference committee decided to abandon the non-preemption clause, discussed *supra* note 3, which would have ensured that states could enforce benefit requirements only if those requirements were more favorable to beneficiaries than federal standards. In combination with the precursor to paragraph (A), *see* H.R.2015, 105th Cong. § 4001 (section 1856(b)(5)), *reprinted in* 143 Cong. Rec. H4416, H4446 (daily ed. June 25, 1997), that proviso would have been surplusage.

6. Of course, regardless of agency action, background principles of implied preemption dictate that state law falls whenever it collides with federal law. *See Gade,* 505 U.S. at 98, 112 S.Ct. 2374 (plurality op.).

zations to be licensed under state law. Paragraph (2) outlines a mechanism whereby provider-sponsored organizations can secure waivers of this requirement from the Secretary. As a condition to procuring such a waiver, an organization must comply with all state consumer protection and quality standards insofar as such standards "are consistent with the standards established under this part." *Id.* § 1395w–25(a)(2)(G)(i)(III). In the very next sentence, the statute warns that "[s]uch standards shall not include any standard preempted under section 1395w–26(b)(3)(B) of this title." This warning is gibberish *unless* subparagraph (B) itself preempts certain state standards—an assumption that is fundamentally incompatible with the Commissioner's characterization of that subparagraph as a mere list of examples.

### 2.

Although textual analysis resolves the statutory construction issue, we sometimes have looked to legislative history to confirm textual intuitions. *See, e.g., United States v. Meade,* 175 F.3d 215, 219 (1st Cir.1999); *Barker v. United States Dep't of Labor,* 138 F.3d 431, 436 (1st Cir.1998). In an abundance of caution, we do so here.

A brief survey of the BBA's legislative history reinforces our belief that we have reached the correct destination. The conference report that preceded the law's passage lacks any compelling evidence that Congress intended to limit the preemption of state benefit requirements to those that directly conflict with federal law. To the contrary, the committee justified the preemption paragraph on the following basis:

> The Conferees believe that the Medicare + Choice program will continue to grow and eventually eclipse original fee-for-service Medicare as the predominant form of enrollment under the Medicare program. Under original fee-for-service, the Federal government alone set

legislative requirements regarding reimbursement, covered providers, covered benefits and services, and mechanisms for resolving coverage disputes. Therefore, the Conferees intend that this legislation provide a clear statement extending the same treatment to private Medicare + Choice plans providing Medicare benefits to Medicare beneficiaries.

H.R. Conf. Rep. No. 105–217, at 638, *reprinted in* 1997 U.S.C.C.A.N. 176, 259. This excerpt demonstrates that Congress intended the federal government—and the federal government alone—to set requirements anent "covered benefits."

The Commissioner accepts this conclusion, but strives to carve out an exception large enough to shelter the Commonwealth's drug-benefit mandate. She argues that supplemental benefits do not constitute either "covered" or "Medicare" benefits, so the quoted passage cannot be read to manifest an intent to preempt state regulation of supplemental benefits. This argument fails to persuade. In the first place, the corresponding statutory provision addresses "[b]enefit requirements," 42 U.S.C. § 1395w–26(b)(3)(B)(i), not "covered" or "Medicare" benefits, an omission that undermines the Commissioner's heavy reliance on these qualifying terms. In the second place, the BBA makes the provision of supplemental benefits dependent upon the Secretary's approval. *See id.* § 1395w–22(a)(3)(A). Thus, those benefits arguably are "covered" by the Program.

Looking beyond what Congress said to what Congress actually did,[7] we find affirmative support for our interpretation of subparagraph (B). At the same time that it created subparagraph (B), Congress eliminated a provision that would have accomplished exactly the result which the Commissioner and her amici urge this court to adopt. An earlier version of the House bill provided that a state could enforce its own beneficiary requirements if such requirements were more stringent

---

7. One parting glance: we find nothing to contradict our holding in the general statements of Senator Bryan cited to us by the Commissioner and the amici. *See* 143 Cong. Rec. S8401 (daily ed. July 31, 1997).

than those established under federal law. *See* H.R.2015, 105th Cong. § 4001 (section 1852(n)), *reprinted in* 143 Cong. Rec. H4416, H4441 (daily ed. June 25, 1997). The conference agreement that added subparagraph (B) deleted this provision. *See* H.R. Conf. Rep. No. 105–217, at 611, 637–38, *reprinted in* 1997 U.S.C.C.A.N. 176, 231–32, 258–59. Notably, the precursor to paragraph (3) in the same draft version also had included language to the effect that consumer protections more exacting than those established under subsection (b) would not be preempted by federal regulation. *See* H.R.2015, § 4001 (section 1856(b)(5)), *reprinted in* 143 Cong. Rec. at H4446. Again, the conference committee eliminated this language. Congress sometimes can speak as clearly by opting not to enact proffered language as by enacting it. *See, e.g., INS v. Cardoza–Fonseca,* 480 U.S. 421, 442–43, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." (citation and internal quotation marks omitted)); *United States v. Rivera,* 131 F.3d 222, 226–27 (1st Cir.1997) (similar); *Rhode Island v. Narragansett Indian Tribe,* 19 F.3d 685, 700 (1st Cir.1994) (similar). And when Congress speaks, courts charged with the delicate work of statutory construction should listen.

## III. CONCLUSION

The road we have traveled has been long and winding. Massachusetts posits that the arduousness of the journey itself requires reversal: Congress's intent cannot be "clear and manifest," *Rice,* 331 U.S. at 230, 67 S.Ct. 1146, if this court can discern it only after undertaking such an odyssey. But this is an especially intricate preemption regime, and courts must do their best to animate complex statutes as well as simple ones. In this instance, the length of our journey more accurately reflects the variety of the arguments advanced rather than any uncertainty inherent in the statutory regime—and we perhaps have prolonged matters unduly by pausing along the way to illuminate subtle flaws in those arguments out of respect for the earnestness that underlies them. Finally, and most importantly, we have felt it incumbent upon us to explain how one—and only one—interpretation of the language that Congress chose imbues each statutory provision with genuine meaning.

We need go no further.[8] Congress's intent to prefer an exclusively federal regulatory scheme and to preempt all state benefit requirements is clear and manifest, even if not immediately apparent. Consequently, the judgment below must be

*Affirmed.*

---

8. The parties and the amici present various policy arguments in support of their position. We do not address these arguments. Where, as here, a fair reading of the statutory text does not contradict any overriding legislative goal, the push and pull of competing policies is best left to Congress.