**NORTHWESTERN SELECTA, INC., Plaintiff,**

v.

**Hon. Miguel O. MUNOZ, Secretary of the Department of Agriculture, in His Personal and Official Capacity, Defendant.**

**Ciivl 00–1106CCC.**

United States District Court, D. Puerto Rico.

June 22, 2000.

Rebeca F. Rojas, Reichard & Escalera, Isla Verde, PR, for plaintiff.

Leticia Ramírez–Rangel, Angel E. Rotger–Sabat, Attorney General, Commonwealth of Puerto Rico, Department of Justice, Federal Litigation Division, Miramar, PR, for defendant.

## OPINION AND ORDER

CEREZO, District Judge.

Plaintiff filed this declaratory judgment action and request for injunctive relief alleging deprivation of its federally protected rights under the Supremacy Clause, the Commerce Clause, the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment. Presently before the Court is its Memorandum in Support of a Request for Preliminary and Permanent Injunction **(docket entry 19)**, the opposition filed by the Secretary of the Department of Agriculture of the Commonwealth of Puerto Rico, Miguel O. Munoz ("the Secretary") **(docket entry 18)** and the United States Department of

Agriculture's ("USDA") Amicus Curie Brief (**docket entry 17**).

Plaintiff Northwestern Selecta, Inc. ("NWS"), claims that "the Poultry Products Inspection Act, 21 U.S.C. § 467e, (PPIA) expressly preempts Market Regulation Number 8, as adopted by the Department of Agriculture of Puerto Rico." The USDA contends that the Commonwealth's requirement that the certificate of inspection bear the date in which the USDA inspected the product is a labeling requirement "in addition to" and "different than" those mandated by federal law and that such requirement is preempted by federal law. In contrast, defendant alleges that the Poultry Products Inspection Act does not preempt the entire field of poultry inspection and therefore does not exclude regulatory steps taken by the states to exercise their police power by enacting and enforcing health and safety regulations.

## I. BACKGROUND

Plaintiff is an importer of frozen poultry which it distributes in Puerto Rico. The Commonwealth's Department of Agriculture adopted Market Regulation No. 8. The sections of Market Regulation No. 8 in controversy which deal with frozen poultry provide as follows:

**Section IV. Requirements for the Inspection of Poultry Meat to Puerto Rico**

A. Any person importing poultry meat to be marketed in Puerto Rico shall provide himself with documents or certificates accreditative of the date in which the product in question was inspected for wholesomeness. *Such certificates shall be issued in official establishments operating under the poultry inspections service of the Department of Agriculture of the United States. Said documents, which show the date of inspection shall be issued by an inspector of said Department or by an official of the plant in which the product was inspected, upon completion of the processing, inspection, and packing operations of the product.* In the case of poultry to be marketed fresh (not frozen) the inspection for wholesomeness shall have been made within one hundred and ninety-nine (199) hours prior to its unloading in any port or airport in Puerto Rico. *In the case of poultry to be marketed frozen the inspection for wholesomeness shall have been made within thirty (30) days prior to its unloading in any port or airport of Puerto Rico.* (emphasis supplied)

**Section V. Certificates or Documents**

"A. The certificates or documents required on Subsections A of Section IV shall indicate among other things, the following:

1. Number of the certificate or document date of issuance.

2. Date on which the poultry meat is inspected, in the Official Establishment and number and address of such Official Establishment. In the case of poultry meat to be marketed as fresh (not frozen) it shall be indicated, in addition, the date an hour in which it was inspected and packed.

3. Whether the product is fresh (not frozen) or frozen.

4. Description of the product, including the species and class of poultry, and whether the product consists of ready to cook poultry, disjointed poultry portions and/or giblets. The type of poultry shall be indicated in the case of disjointed poultry portions and/or giblets.

5. Lot number.

6. Signature of the inspection of the Poultry Inspection Service of the United States Department of Agriculture, or an authorized official of the official establishment when the product was inspected.

7. Name and address of the official establishment where the poultry was processed or of the person requesting

the inspection, as well as the name and address of the importer.

8. Any other information deemed pertinent by said inspectors or officials.

B. In the case of federal certificates, the same shall be official certificates of the United States Department of Agriculture.

C. A copy of the original of the certificate of document shall be delivered by the importer or shipper to the Department at the time the inspection is made. The original shall be kept in the importer's files for a period of not less than twenty-four (24) months and shall be made available when requested by an official.

D. These sections shall not be applied to meats of turkey, cornish, hens, ducks, geese, or pheasants, although those meats continue to regulated [sic] by the Poultry Products Inspection Act."

Based on said regulation, the Secretary of the Department of Agriculture, through its inspectors, impounded from December 21, 1999 to January 19, 2000 a total of two hundred and twenty-five thousand (225,-000) pounds of frozen chicken imported by NWS because the certificate of inspection issued by the USDA did not contain the date in which the product was inspected by federal inspectors.

The impounded poultry did not provide a date of inspection. The grounds for prohibiting the sale of the poultry which appear in the detention orders issued by the inspectors of the Puerto Rico Department of Agriculture are two:

1. that the certificate of inspection does not contain the kill date; and,

2. that the Julian Code appearing on the container and/or the certificate of inspection show that more than thirty (30) days have elapsed from the kill date to the date on which the product arrived to Puerto Rico.

According to the Puerto Rico Department of Agriculture, in order for plaintiff to request the release of the detained poultry, it must obtain an amended certificate of inspection signed by the federal inspector certifying the "kill date". The parties have both referred to the kill date as the date of inspection. However, if more than thirty (30) days have elapsed from such date to the date of arrival at Puerto Rico ports, a release is unwarranted, the product is automatically condemned and cannot be marketed in Puerto Rico.

The USDA has advised the Commonwealth's Department of Agriculture in the past that requiring that the date of inspection appear in the federal inspection certificate is preempted by federal law. In its letter of May 10, 1999, addressed to defendant by the USDA, through the Administrator of the Office of Fields Operations ("OFO") of the Food Safety and Inspection Service ("FSIS"), local authorities are advised as follows:

"The requirement in Section IV, subsection A, of Market Regulation No. 8, that any person marketing frozen poultry in Puerto Rico provide documents or certificates to show that the products were inspected within thirty (30) days of its unloading is preempted labeling requirement."

A second notice was given to defendant on August 2, 1999 to the same effect.

"Please note that the explicit language in Section 23 of the Poultry Products Inspection Act (PPIA) 21 U.S.C. § 467e preempts states, including the Commonwealth of Puerto Rico, from imposing any marketing, labeling, packaging, or ingredient requirement 'in addition to, or different than' those made under the PPIA.

The requirement of Section IV, Subsection A, of Market Regulation No. 8, that any person marketing frozen poultry in Puerto Rico provide documents or certificates to show that the products were inspected within thirty (30) days of unloading is a preempted labeling requirement. Federal law does not require that the date appear on the inspection

legend. USDA regulations only require that poultry products be inspected and that certain containers or packages display and inspection legend." (Attachment A USDA's Amicus Curie Brief)

Despite the opposition raised by the federal agency charged with the inspection process of poultry nationwide, defendant has continued to enforce the challenged regulation. To this date a total of three hundred and fifty thousand (350,000) pounds of poultry have been impounded since defendant has continued to detain plaintiff's shipments after the hearing.

## II. CONGRESSIONAL PREEMPTIVE INTENT

The threshold issue in this case is the preemptive effect, if any, that the Poultry Products Inspection Act of 1957, as amended, 21 U.S.C. §§ 451, 467e, has over market Regulation No. 8.

■ Article VI cl.2 of the United States Constitution provides that:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

The Supremacy Clause vests upon Congress the authority to preempt state regulation. *Louisiana Public Service Commission v. F.C.C.*, 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986); *Cipollone v. Liggett Group Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992). When federal law takes precedence over state law it is said that the federal law has preempted the state law. *Black's Law Dictionary*, West Publishing Co., Fifth Ed., p. 1060.

■ The principle derived from the case law is that federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons-either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained. *Florida Lime and Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). Given the assumption against preemption in fields traditionally occupied by the states, state law will not be superseded unless "that was. the clear and manifest intent of Congress." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977) In *Florida Lime and Avocado Growers, Inc., supra*, 83 S.Ct. at 1217 the Court stated that: "The test of whether both federal and state regulations may operate, or the state regulation must give way, is whether both regulations can be enforced without impairing the federal superintendence of the field, not whether they are aimed at similar or different objectives." If the congressional command is "that its enactments alone are to regulate a part of commerce, state law regulating that aspect of commerce must fall." *Id.*

■ The congressional preemptive intent may come in various forms. One of those is when Congress has voiced its intent through explicit preemptive language. *Philip Morris Inc., supra*, at 67.There are, however, instances where Congress does not use explicit language. The court must then consider the federal statute's "structure and purpose" or nonspecific statutory language to ascertain if there is a clear, but implicit, preemptive intent. *Id.* at 67. Preemption also exists when there is a direct conflict between federal regulation and state law. *CSX Transportation Inc. v. Easterwood*, 507 U.S. 658, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) (holding that: "[W]here a state statute conflicts with, or frustrates federal law, the former must give way.") In those cases where direct conflict exists between federal law and state law, the latter must yield. *Tart v. Commonwealth of Massachusetts*, 949 F.2d 490, 500 (1st Cir.1991). There is conflict where the state law stands as an obstacle to the accomplishment and execu-

tion of the full objectives of Congress. *Hines v. Davidowitz*, 312 U.S. 52, 61, 61 S.Ct. 399, 85 L.Ed. 581 (1941); *Jones v. Rath Packing*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)("preemption exists when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.") The case law has also established that a federal agency acting within its congressionally delegated authority may also preempt state regulations. *City of New York v. F.C.C.*, 486 U.S. 57, 63–64, 108 S.Ct. 1637, 100 L.Ed.2d 48 (1988). In those instances the analysis centers on the federal agency that seeks to displace state law and on the proper bounds of its lawful authority to undertake such action. *Id.* 108 S.Ct. at 1642.

■ The critical inquiry in any preemption controversy is always whether Congress intended federal regulation to supersede state law. *Louisiana Public Service Commission, supra*, 106 S.Ct. at 1899. The trial court must ascertain whether Congress intended to set aside any state law when it enacted the federal statute. *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 67 (1st Cir.1997). The crucial point is to determine if Congress had an intent to preempt state regulation. *Pedraza v. Shell Oil Co.*, 942 F.2d 48, 51 (1st Cir.1991)("Preemption boils down to a matter of congressional intent."); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 2255, 135 L.Ed.2d 700 (1996) citing *Cipollone, supra*, (" '[t]he purpose of Congress is the ultimate touchstone' in any preemption case. . .") *Id.* 116 S.Ct. at 2250 and *Mass. Ass'n of Health Maintenance v. Ruthardt*, 194 F.3d 176, 179 (1st Cir.1999) for guidance on the task of interpreting a statutory provision that expressly preempts state law.

### III. THE PREEMPTION CONTROVERSY

### A. THE "IN ADDITION TO" STATUTORY LANGUAGE

The purpose of the PPIA was to provide for the inspection of poultry and poultry products and to regulate their processing and distribution to prevent the movement or sale in interstate or foreign commerce of such products which are adulterated or misbranded. *See* 21 U.S.C. § 452, which sets forth the Congressional declaration of policy. To that end, the PPIA provides for the inspection of poultry products, *ante* and *post* mortem, in official establishments (§ 455), provides for the operation of each official establishment slaughtering poultry or processing poultry products for commerce in accordance with sanitary practices required by regulations promulgated by the Secretary of Agriculture (§ 456), and establishes requirements for labeling and marking of all products inspected at any official establishment under the authority of the PPIA. Section 458 of the statute sets forth in detailed manner the acts which are prohibited, including the forging of any official mark or certificate or the simulation, alteration, or destruction of any official mark or certificate. Section 458(c)(3) establishes that "no person shall, contrary to the regulations proscribed by the Secretary, fail to use or to detach, deface, or destroy any official device, mark or certificate."

Congress' intention to protect the consumer of poultry products from adulteration or misbranding resulted in the establishment of programs to give federal assistance to the appropriate state agencies in developing and administering state poultry product inspection programs. At section 454, the law provides for financial aid for the administering of such programs as well as training and technical assistance. These state inspection programs for the slaughtering of poultry or processing of poultry products for distribution within a state which receive such assistance must comply with requirements that are at least equal to those established under the federal statute. Although the states retain jurisdiction over intrastate commerce, pursuant

to section 454(c)(1), state plants can be placed under the supervision of the Secretary. If a state at the expiration of a two year period fails to enforce, requirements at least equal to those imposed by the PPIA, the Secretary shall designate the state as one in which federal statutory standards wholly govern its intrastate operations.

This statutory framework served as a pioneer state/federal program which coordinated efforts to achieve the goal of protecting consumers from the harm resulting from adulterated poultry caused by deficient inspection or the lack thereof. The statute pursues placing state inspection programs at a par with federal inspection requirements, through the assistance provided to the states in this area. State/federal relations with regards to exclusion from state regulation are specifically addressed in section 467e of the statute which deals with non-federal jurisdiction of federally regulated matters.

There is no doubt that Congress, pursuant to § 467e, intended to preempt requirements imposed by the state which are "in addition to" or "different from" the "marking" requirements established in the PPIA, as amended. 21 U.S.C. § 451. The express preemption clause of the PPIA provides:

> "**Marking**, labeling, packaging, or ingredient requirements (or storage or handling requirements found by the Secretary to unduly interfere with the free flow of poultry products in commerce) in addition to, or different than, those made under this chapter may not be imposed by any State or Territory or the District of Columbia with respect to articles prepared at any official establishment in accordance with the requirements under this chapter, but any State or Territory or the District of Columbia may, consistent with the requirements under this chapter, exercise concurrent jurisdiction with the Secretary over articles required to be inspected under this chapter, for the purpose of preventing the distribution for human food purposes of any such articles which are adulterated or misbranded and are outside of such an establishment, or, in the case of imported articles which are not at such an establishment, after their entry into the United States." (Emphasis ours.) 21 U.S.C. § 467e.

Chapter 3 of Title IX of the Code of Federal Regulations contains the rules and regulations that implement the provisions of the PPIA. Its subpart M describes the wording and form of the various official marks which are used during the federal inspection process, such as the official inspection legend, the official poultry inspection certificate, and the official poultry condemnation certificate. We must determine whether the inspection certificate bearing the date of the federal inspection, required by local authorities pursuant to Market Regulation No. 8, imposes a marking requirement "in addition" to those established under the PPIA with respect to articles prepared at official establishments in accordance with the requirements under the PPIA. Contrary to plaintiff's discussion of the issue, we believe that the preemption determination in this case centers on the marking, not the labeling, requirements. Section 467e of the PPIA exempts both from state regulation.

Market Regulation No.8 requires that persons importing poultry into Puerto Rico must present to local authorities documents or certificates accrediting the date of inspection. It is undisputed that the official poultry inspection certificate authorized by the applicable federal regulation does not bear the date of inspection. Accordingly, the local requirement of such date is first enforced when the frozen poultry is unloaded in Puerto Rico and after it has passed federal inspection and been certified as wholesome in official establishments in the mainland. If the importer cannot produce a certificate containing the date of inspection, the imported poultry cannot be distributed in Puerto Rico. In addition, if more than thirty (30) days have

elapsed from the date of the federal inspection to the date the products arrive at port, the poultry is detained and cannot be marketed, pursuant to the provisions of the challenged regulation. The date of inspection is the determinative factor for the admittance of the product to the local market.

The federal inspection process generates a series of official marks or markings which are the subject matter of a set of very specific regulations. An "official certificate" is defined by the PPIA as "any certificate prescribed by the regulations of the Secretary for issuance by an inspector or other person performing official functions under this chapter." 21 U.S.C. § 453(n). The terms "official mark," "official inspection legend" and "official certificate" are all defined in the federal regulations which implement the poultry inspection statute. The different official marks required to be used with respect to inspected and passed poultry products are described in detail in Subpart M of Chapter 3, Title 9 Code of Federal Regulations. In addition to the verbal descriptions, the regulations illustrate each official mark with symbols or figures.

Section 381.97, for example, provides the wording and the form of the "official inspection legend." The exact wording for this mark, "Inspected for Wholesomeness U.S. Department of Agriculture," must be contained within a circle. The verbal description of this particular official mark is illustrated in figure 1 of section 381.97 of Title 9 of the Code of Federal Regulations. The regulation also states where the establishment number shall appear. It warns that "the form and arrangement of such wording shall be exactly as indicated in the example in figure 1." Abbreviated forms must be approved by the administrator.

Section 381.96 states the manner in which the "official inspection legend" shall be printed or affixed to containers of inspected and passed poultry products. The degree of detail of this regulation is re-

flected in its last sentence which provides that "when applied by stencil the legend shall not be less than four inches in diameter."

The form of the "official poultry inspection certificate" authorized by the regulation appears in detailed form in section 381.109. This regulation also requires an exact wording. The certificate must bear the following legend:

"U.S. DEPARTMENT OF AGRICULTURE ANIMAL AND PLANT HEALTH INSPECTION SERVICE MEAT AND POULTRY INSPECTION PROGRAM

POULTRY INSPECTION CERTIFICATE

And the seal of the U.S. Department of Agriculture, with a certification that the poultry described therein had been inspected in compliance with the Regulations of the Secretary of Agriculture Governing the Inspection of Poultry and Poultry Products.

(b) The certificate also bears a serial number such as "B 3208" and shows the respective name and address of the applicant, the shipper or seller and the receiver or buyer and the net weight in pounds of amount passed, amount rejected or condemned, type of poultry, lot number and class, and such other information as the Administrator may prescribe or approve in specific cases."

Section 381.110 prohibits erasures or alterations on any official certificate or copy which has not been initialed by the issuing inspector.

In sum, Subpart M of the federal regulations on official marks and certificates sets forth the marking requirements in excruciating detail as to all events and phases of the federal inspection of poultry and poultry products.

■ The date the inspection took place is not required in any of these regulations. Only the specific information set forth in Subpart M, §§ 381.96 et seq., of

Title 9 of the Code of Federal Regulations must appear in the official certificates and markings issued during the course of the inspection process. Having considered the plain language of the statute's preemption provision precluding marking requirements by any state or territory which is in addition to or different from those established in the PPIA and its regulatory scheme as well as the purpose of the statute as a whole, Court concludes that Market Regulation No. 8 adopted by the Department of Agriculture of the Commonwealth of Puerto Rico imposes a marking requirement in addition to those mandated by federal law. To that extent, the Commonwealth's requirement of a certificate or document accrediting the date of the federal inspection is preempted by section 467e of the PPIA.[1]

The federal regulations on official marks and certificates used with respect to the inspection of poultry products are so precise with respect to the wording and form of these marks and so clear in their prohibition of any deviation from the official forms approved, that we must conclude that the need for uniformity is paramount in this aspect of the federal inspection program. The legislative history of the PPIA reflects that the committee deleted a provision which would have permitted plants that were regulated only by a state to ship their products across state lines. This was opposed by consumer groups, labor unions and industry organizations on the ground that it would "endanger the present federal inspection program and threaten the uniformity of inspection." *3 U.S.Code Congressional and Administrative News*, at p. 3453–54. This provision was deleted even though these state programs were operating under requirements which were at least equal to the federal ones.

The inspection process done in accordance with the requirements established by the statute and its regulatory scheme is the key element in obtaining the goals which this piece of legislation aims to achieve: the nationwide distribution of wholesome, unadulterated poultry products. The regulations on labeling and marking requirements are essential to achieve an effective inspection program In order to prevent injury to consumers and losses to poultry producers. Uniformity in the marking and labeling requirements used in the process of inspection for wholesomeness of poultry products is necessary to ensure compliance and effective application of those requirements. The official certificate of inspection includes everything that federal regulators deemed to be a necessary part of the process and of the information disclosed. The information requested at the port of entry on the date of inspection, require local authorities in addition to the data that appears in the official poultry inspection certificate signed by a federal inspector, threatens the uniformity which the regulations on official marks have achieved.

## B. THE SECRETARY'S ARGUMENT

The Secretary's argument that the "Act" does not forbid the Commonwealth of Puerto Rico from adopting regulatory measures to protect the health and safety of its citizens fails because neither of the challenged sections contained in Market Regulation No. 8 attack the evils that the "Act" sought to prevent. Neither plaintiff nor the USDA dispute the local authorities' inspection of imported poultry for wholesomeness. However, the joint requirement of the date of **inspection** and the exclusion, **without inspection**, upon expiration of the 30 days impair the federal regulatory scheme which governs the

---

**1.** *Swift & Co. v. Wickham*, 364 F.2d 241 (2nd Cir.1966), relied upon by defendant, does not lend support to his position. That case was decided under the original PPIA, two years before its amendment. In 1968, the statute was amended to add, among others, section 23, 21 U.S.C. § 467e, which provides that the States cannot impose marking, labeling and other related requirements in addition to or different than federal requirements.

inspection process throughout the nation and create an obstacle to the free flow of commerce.

Under the "Act," the states were empowered to establish inspection programs to assist the federal government in the elimination of contaminated poultry from being distributed in interstate commerce. However, rather than leaving in the hands of the states to define what constitute "adulterated poultry," Congress provided a comprehensive definition of that term. *See.* 21 U.S.C. § 453(g). Pursuant to the statute, poultry is deemed to be adulterated if:

(1) it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance, such article shall not be considered adulterated under this clause if the quantity of such substance in or on such article does not ordinarily render it injurious to health;

(2)(A) it bears or contains (by reason of administration of any substance to the live poultry or otherwise) any added poisonous or added deleterious substance (other than one which is (i) a pesticide chemical in or on raw agricultural commodity; (ii) a food additive; or (iii) a color additive which may, in the judgment of the Secretary, make such article unfit for human food);

(B) if it is, in whole or in part, a raw agricultural commodity and as such commodity bears or contains a pesticide chemical which is unsafe within the meaning of section 346a of this title;

(C) if it bears or contains any food additive which is unsafe within the meaning of section 348 of this title;

(D) if it bears or contains any color additive which is unsafe within the meaning of section 379a of this title: Provided, That an article which is not otherwise deemed adulterated under clause (B), (C), or (D) shall nevertheless be deemed adulterated if use of the pesticide chemical, food additive, or color additive in or on

such article is prohibited by regulations of the Secretary in official establishments;

(3) if it consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food;

(4) if it has been prepared, packed, or held under insanitary conditions whereby it may have become contaminated with filth, or whereby it may have been rendered injurious to health;

(5) if it is, in whole or in part, the product of any poultry which has died otherwise than by slaughter;

(6) if its container is composed, in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health;

(7) if it has been intentionally subjected to radiation, unless the use of the radiation was in conformity with a regulation or exemption in effect pursuant to section 348 of this title;

(8) if any valuable constituent has been in whole or in part omitted or abstracted therefrom; or if any substance has been substituted, wholly or in part therefor; or if damage or inferiority has been concealed in any manner; or if any substance has been added thereto or mixed or packed therewith so as to increase its bulk or weight, or reduce its quality or strength, or make it appear better or of greater value than it is.

Defendant neither has alleged nor proven that plaintiff's detained products are either adulterated or deleterious, yet seeks to withdraw them from interstate commerce.

█ Instead of conducting an inspection to determine the wholesomeness of the poultry imported, defendant relies on an automatic exclusion that operates once the thirty day period has elapsed. Its course of action is contrary to the "Act" because the federal program sought to screen out adulterated poultry by way of a compre-

hensive inspection program. 3 *U.S.Code Congressional and Administrative News,* 3439 (1968). When state law stands as an obstacle to the full implementation of a federal law, it is not enough to say that the ultimate goal of both state and federal law is the same. *Gade v. National Solid Wastes Management Ass'n,* 505 U.S. 88, 103, 112 S.Ct. 2374, 2385, 120 L.Ed.2d 73 (1992).

■ The sole fact that the imported poultry had been inspected by federal authorities more than thirty days prior to unloading in Puerto Rico does not render it unwholesome for purposes of the "Act." Moreover, the statute specifically provides that detentions are restricted to 20 days and condemnation determinations must be based on concrete data, not mere conjectures or suppositions. 21 U.S.C. §§ 452, 467(a), 467(b). None of the impounded poultry in this case has been subjected to an inspection which would reveal if any of it is unsuitable for human consumption. Simply stated, defendant's actions have created an undue burden without any support in the Act. Under the federal statute federal, state authorities can only remove poultry from interstate commerce when it is determined that it is unfit for human consumption. The implementation of the local market regulation results in the automatic wholesale detention of thousands of pounds of poultry products without taking into account any criteria or information to determine wholesomeness other than absence of date of inspection and application of the 30 day exclusion rule.

Congress' definition of what amounts to adulterated poultry is ample and detailed. It has not been alleged nor demonstrated that plaintiff's impounded merchandise falls within this definition. Defendant's reliance on the alleged violations to Market Regulation number 8 are insufficient to eliminate three hundred and fifty thousand pounds of poultry from interstate com-

merce. Our decision today does not foreclose the Commonwealth from adopting the necessary inspection measures to ensure that adulterated poultry is eliminated from interstate commerce or from its own boundaries, thus protecting the health and safety of its citizens.

## IV. DEFERENCE TO FEDERAL AGENCY'S OPINION

■ Although the USDA, has specifically stated that under federal law said information does not have to appear in the grading certificate, the Commonwealth's Department of Agriculture insists in requiring it. The USDA, the agency entrusted with the enforcement of the "Act," [2] has informed the Commonwealth that its regulation requiring the date of inspection in the certificate is contrary to the purpose of the "Act." [3] This Court must defer to the USDA's interpretation of the "Act" absent a showing of unreasonableness on the part of the defendant. *NationsBank of N.C. v. Variable Annuity Life Ins.,* 513 U.S. 251, 256, 115 S.Ct. 810, 813, 130 L.Ed.2d 740 (1995). ("It is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute.")

In view of the foregoing, the Court finds that Market Regulation Number 8 (Section IV(A)) is preempted by federal law and is in violation of the Supremacy Clause of the United States Constitution.

SO ORDERED.

---

**2.** 3 *U.S.Code Congressional and Administrative News,* 3437 (1968); 21 U.S.C. § 451.

**3.** *See* attachment A to USDA's Amicus Curie Brief.